[No. H037287. Sixth Dist. Oct. 18, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
EVERETT ROBERT WALKER, Defendant and Appellant.

**COUNSEL**

Rachel Sue Sussman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit and Laurence K. Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**DUFFY, J.**[*]—Everett Robert Walker, a young Black man, disembarked late in the evening in November 2010 from a train at the light-rail station in downtown San Jose. He was stopped by Santa Clara County Deputy Sheriff Frank Thrall, who suspected that defendant might have been one of two young Black male suspects involved in a sexual battery occurring one week

---

[*]Retired Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

earlier at the same station. The deputy asked defendant to show proof that he had paid the fare, and he responded by asking why the deputy was singling him out among all passengers. Deputy Thrall indicated that he had a right to ask defendant for proof of fare and that he resembled a suspect in a sexual battery investigation; he then asked defendant for identification. After he was detained by the deputy and defendant produced an identification card determined to belong to someone else, he was arrested. A search incident to the arrest yielded cocaine base and marijuana.

Defendant moved to suppress seized evidence pursuant to Penal Code section 1538.5.[1] The court denied the motion to suppress. Defendant then pleaded guilty to the felony offense of cocaine base possession for sale or purchase, as well as a misdemeanor and an infraction. The court suspended sentencing and granted three years' probation.

Defendant challenges the conviction entered on his guilty plea, contending his detention, warrantless search, and arrest constituted an unreasonable search and seizure because Deputy Thrall did not have a reasonable and articulable suspicion that defendant had been or was about to be engaged in criminal activity. Defendant argues that because the deputy did not have a reasonable suspicion supporting his decision to detain defendant, his subsequent production of the false identification and the contraband discovered during the search of his person when he was arrested should have been suppressed. We agree with defendant that Deputy Thrall did not have a reasonable suspicion of defendant's involvement in criminal activity at the time he was detained. Accordingly, because the trial court's contrary finding was not based upon substantial evidence, we will reverse the order of probation and remand the matter to the trial court with directions to dismiss the cause.

## PROCEDURAL AND FACTUAL BACKGROUND[2]

### I.  *The Information*

Defendant was charged by information with possession of cocaine base for sale, a felony (Health & Saf. Code, § 11351.5); giving a false name to a

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

[2] The facts relevant to the challenged search and seizure are taken from the evidentiary hearing on defendant's motion to suppress. "Since the trial court resolved this matter in favor of the prosecution, for purposes of this proceeding we view the record in the light most favorable to the People's position." (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 780 [195 Cal.Rptr. 671, 670 P.2d 325].)

peace officer upon lawful detention or arrest, a misdemeanor (§ 148.9); and possession of 28.5 grams or less of marijuana, an infraction (Health & Saf. Code, § 11357, subd. (b)).

## II.   The Motion to Suppress

### A.   Contentions

Defendant argued generally in his motion to suppress evidence pursuant to section 1538.5 that "[t]he detention, search, seizure and arrest in the present case were unreasonably conducted without a search or arrest warrant" and that "[a]ll evidence found as a result must be suppressed . . . ." He asserted further that because the search or seizure occurred without a warrant, it was the People's burden to provide evidence that the search or seizure was constitutionally justified.

The People opposed the motion. They argued that the detention and subsequent arrest of defendant were lawfully conducted. They claimed that the initial encounter was lawful because Deputy Thrall had a right to demand that defendant show proof that he had paid the fare. The People cited section 640, subdivision (c) in support of this position. Secondly, they argued, citing *Terry v. Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], that defendant's detention was lawful because Deputy Thrall "ha[d] a reasonable suspicion that criminal activity [was] afoot and that [defendant was] connected with it. [Citation.]" That reasonable suspicion was based upon "the totality of [the] circumstances," including the deputy's having observed defendant exiting the train at the station where a sexual battery had occurred one week earlier and having concluded "that Defendant resembled the suspect in many ways: height, weight, age, nose shape, hair color, hair line and skin color."

### B.   Evidence

An evidentiary hearing followed on June 21, 2011. The evidence presented at the hearing, consisting of the testimony of two witnesses, follows.

Detective Henry Woo of the Santa Clara County Sheriff's Office prepared an e-mail on November 18, 2010, concerning an incident that had occurred one week earlier. He reported that there had been a sexual battery at approximately 12:20 p.m. on November 11, 2010, at the Santa Clara South

light-rail station in downtown San Jose. Detective Woo requested that deputies be on the lookout for two adult Black male suspects who had been involved in the incident. He described one of the suspects (Suspect One) as a "[B]lack male adult, approximately in his 20's, approximately six[-]one, 195, short afro, clean shaven, light complected, appeared unkempt[,] wearing a backpack." Detective Woo described the other suspect (Suspect Two) as a "[B]lack male adult, 30's, approximately five[-]five, 195, short hair[,] unkempt with a body odor[,] wearing a black sweatshirt jacket with a hood and black pants." He indicated in the e-mail that "[b]oth [suspects] appear to be regulars in the area as one pointed out his 'crew' nearby." Detective Woo included as attachments to his e-mail several photographs of the suspects obtained from surveillance video.

On the evening of November 18, 2010, Deputy Thrall was working as "a member of the route stabilization team[,] which is a plain clothes detail which is responsible for directed enforcement within the public transportation system . . . focus[ing] on street-level crimes . . . ." At the start of his shift that day at 2:00 p.m., he and other deputies were briefed by a supervisor about the November 11 sexual battery. Pursuant to the supervisor's instructions, Deputy Thrall reviewed Detective Woo's e-mail and its attachments and also viewed the surveillance video capturing the November 11 crime. At approximately 10:15 p.m. that evening, he (in uniform) and two other deputies were patrolling the Santa Clara South light-rail station. Deputy Thrall described the area as being "commonly known as Fountain Alley. It's known to deputies . . . as well as police officers . . . as a high crime area, open area market for narcotic[s] sales."

At that time, Deputy Thrall observed defendant aboard a southbound train. He noticed defendant in particular because "[h]e resembled one of the suspects from the sexual battery photos that [he] had seen earlier." Specifically, he resembled one of the suspects in "[h]eight, weight, age, hairline from the photographs and the shape of his nose." Deputy Thrall decided "to make contact with [defendant] and identify him as a possible suspect in the battery." He approached the car in which defendant had been traveling while he was standing on the platform and asked him for proof of fare.[3] Defendant asked why he was being singled out among all of the passengers. Deputy Thrall responded that he had the right to ask defendant to prove that he had paid for his ticket and further that defendant resembled a suspect in a sexual battery case and Deputy Thrall wanted to identify him. The deputy asked for identification, and defendant responded that he had none. Two other uniformed deputies arrived at that time; defendant was looking around and

---

[3] Deputy Thrall testified that one of his duties is to check Valley Transit Authority (VTA) passengers for fare evasion. He has a citation booklet with him on patrol; the booklet was in his car, not on his person, at the time he stopped defendant to ask him for proof of fare.

because Deputy Thrall thought he might attempt to flee, he asked defendant to have a seat on a bench located on the platform. The deputy again asked for identification, and defendant produced a San Jose State University student body card containing the name "Aalim Moor" with "a VTA fare sticker attached to it" for the period of August 25, 2010, to March 4, 2011. It appeared to the deputy to be a valid fare. Approximately five minutes elapsed from Deputy Thrall's initial contact to the time defendant produced the student identification.

Deputy Thrall handed the student body card to his partner and requested that he contact dispatch to perform a records check. As a result of this records check, the deputy learned that the birth date of Aalim Moor was one month earlier than the birth date defendant had indicated, and that Moor was six feet two inches tall; Deputy Thrall testified that defendant "was significantly shorter than that." Deputy Thrall concluded that defendant had provided false identification to a peace officer in violation of section 148.9 and therefore arrested him.

In a search of defendant after his arrest, a California driver's license showing defendant's true name was found. A booking photograph of defendant was introduced into evidence by the defense, which the deputy indicated was a fair and accurate depiction of defendant's appearance at the time of the arrest. Deputy Thrall testified that at the time of the arrest, defendant was 19 years old; was five feet 10 inches tall; weighed approximately 180 pounds; had short black hair; was of medium to dark complexion; had a mustache and a slight goatee; was well groomed; and was wearing a gray sweatshirt, blue jeans, and blue and white shoes. He also "had a cap or a hat" when the deputy initially contacted him.[4] In response to a question on cross-examination about whether he had thought that defendant "possibly resembled suspect one of the two suspects" identified in Detective Woo's e-mail, Deputy Thrall responded in the affirmative.

C. *Order*

After submission of the matter following testimony and argument, the court denied defendant's motion to suppress. It concluded that defendant's physical appearance "closely matched the description of one of the suspects" involved in the prior sexual assault, namely, Suspect One. It reasoned that because "humans are creatures of habit," "the fact that Defendant was seen exiting a train at the same train station where the sexual assault occurred is compelling."

---

[4] The record does not reflect whether or not defendant was actually wearing a hat or a cap at the time Deputy Thrall detained him.

III. *The Plea*

Defendant pleaded guilty to all three counts, conditioned on being granted probation on the felony count. On August 19, 2011, the court suspended imposition of the sentence on the felony conviction and placed defendant on probation for three years, conditioned on serving 252 days in county jail. Defendant filed a timely notice of appeal of the denial of the motion to suppress. The denial of the suppression motion may be challenged by an appeal from the judgment entered after defendant's guilty or no contest plea. (§ 1538.5, subd. (m); *People v. Lilienthal* (1978) 22 Cal.3d 891, 896 [150 Cal.Rptr. 910, 587 P.2d 706].)

## DISCUSSION

I. *Standard of Review*

"An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. [Citations.] [¶] In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] 'The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review.' [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, . . . is also subject to independent review." (*People v. Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221]; see *People v. Ayala* (2000) 23 Cal.4th 225, 255 [96 Cal.Rptr.2d 682, 1 P.3d 3].) All presumptions favor the trial court's exercise of its power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence, and draw factual inferences, " 'and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence.' " (*People v. Leyba* (1981) 29 Cal.3d 591, 596–597 [174 Cal.Rptr. 867, 629 P.2d 961], quoting *People v. Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) And where, as is the case here, there is no controversy concerning the underlying facts, our task is simplified: The only issue is whether that rule of law, as applied to the undisputed historical facts, was or was not violated. This is an issue for our independent review. (See *People v. Thompson* (2006) 38 Cal.4th 811, 818 [43 Cal.Rptr.3d 750, 135 P.3d 3].)

## II. *Denial of Motion to Suppress*

### A. *Parties' Contentions*

Defendant argues that the court erred in denying his motion to suppress. He contends that there was no substantial evidence to support the court's conclusion that Deputy Thrall had an objectively reasonable suspicion when he detained defendant that he was one of the suspects who had committed the sexual battery one week earlier. Defendant challenges the court's finding that defendant "closely fit the physical description of the suspect" as the basis for concluding that Deputy Thrall's reasonable suspicion was well grounded. He argues further that the fact that defendant was the same race and approximate age of one of the two suspects, standing alone, was insufficient to justify the detention. Additionally, the fact that defendant was seen at the same train station where the crime had been committed—even assuming the area was a high-crime neighborhood—did not warrant detaining him, because reasonable suspicion cannot be based solely on factors unrelated to the defendant. And he posits that the fact that the crime Deputy Thrall was investigating was not recent required a greater degree of similarity between defendant and the suspect in order to justify the stop. Accordingly, defendant argues, "[o]bjectively, reasonable suspicion that [defendant] was the suspect in the sexual assault could not have existed because [defendant] did not resemble the description. Thus, the court [did] not bas[e] its findings on substantial evidence."

The Attorney General responds that there was sufficient evidence supporting the trial court's finding that Deputy Thrall had an objectively reasonable suspicion for detaining defendant because of his resemblance to one of the sexual assault suspects. She argues: "Deputy Thrall stopped [defendant] because the factual circumstances, including but not limited to [defendant's] resemblance to a sex offense suspect, required a brief stop for investigatory purposes." The Attorney General also argues that because Deputy Thrall had the right to demand that defendant show proof of fare and defendant failed to provide it, the detention was justified on this alternative basis.

### B. *Applicable Law*

■ The legal basis upon which a peace officer may detain a citizen has been explained as follows: "[I]n order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity." (*In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957], superseded on

other grounds by Cal. Const., art. I, § 28.)[5] "The corollary to this rule, of course, is that an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. [Citation.]" (*In re Tony C., supra,* at p. 893, citing *Terry v. Ohio, supra,* 392 U.S. at p. 22.)

■ In determining the lawfulness of a temporary detention, courts look at the " 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." (*United States v. Arvizu* (2002) 534 U.S. 266, 273 [151 L.Ed.2d 740, 122 S.Ct. 744], quoting *United States v. Cortez* (1981) 449 U.S. 411, 417 [66 L.Ed.2d 621, 101 S.Ct. 690]; see *People v. Souza* (1994) 9 Cal.4th 224, 239 [36 Cal.Rptr.2d 569, 885 P.2d 982].) This standard of " 'reasonable suspicion' . . . [is one] less demanding than probable cause 'not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.' " (*People v. Souza,* at pp. 230–231, quoting *Alabama v. White* (1990) 496 U.S. 325, 330 [110 L.Ed.2d 301, 110 S.Ct. 2412].) And as the United States Supreme Court has noted, "The concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.' [Citation.]" (*United States v. Sokolow* (1989) 490 U.S. 1, 7–8 [104 L.Ed.2d 1, 109 S.Ct. 1581], quoting *Illinois v. Gates* (1983) 462 U.S. 213, 232 [76 L.Ed.2d 527, 103 S.Ct. 2317].)

■ A person is deemed to have " 'been "seized" within the meaning of the Fourth Amendment . . .' [citation] . . . 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " (*Michigan v. Chesternut* (1988) 486 U.S. 567, 573 [100 L.Ed.2d 565, 108 S.Ct. 1975], fn. omitted, quoting *United States v. Mendenhall* (1980) 446 U.S. 544, 554 [64 L.Ed.2d 497, 100 S.Ct. 1870]; see *Wilson v. Superior Court, supra,* 34 Cal.3d at pp. 790–791.) "Examples of conditions which might indicate a 'detention' or 'seizure' under a reasonable person standard include a threatening police presence, the display of a weapon by an officer, the physical touching of the citizen approached, or the officer's language or voice indicating compliance with police demands might be compelled. [Citations.] There is no bright line rule indicating the point at which police conduct becomes a seizure. The

---

[5] "Since the passage of Proposition 8 in 1982 (Cal. Const., art. I, § 28), the subjective belief of the citizen set out in *In re Tony C.*[, *supra,*] 21 Cal.3d 888 . . . , no longer applies in analyzing whether an encounter is a detention. [Citation.] Rather the federal standard of analyzing the objective facts of the incident controls. [Citation.]" (*In re Christopher B.* (1990) 219 Cal.App.3d 455, 460, fn. 2 [268 Cal.Rptr. 8], citing *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744].)

degree of intrusion will vary with each set of facts involving police conduct and the actions of the suspect." (*In re Christopher B., supra,* 219 Cal.App.3d at p. 460.)

### C.  *Analysis of Claim of Error*

■  We address initially the secondary ground upon which the Attorney General contends that the detention was justified, namely, that Deputy Thrall had the right to detain defendant as a passenger to determine whether he had paid his fare. Although this ground was not the basis for the trial court's denial of defendant's motion to suppress, " ' "a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." [Citation.]' [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 976 [17 Cal.Rptr.2d 122, 846 P.2d 704]; see *People v. Hochstraser* (2009) 178 Cal.App.4th 883, 894 [100 Cal.Rptr.3d 728] [applying principle to review of order denying suppression motion].)

In support of her position, the Attorney General cites *People v. Maikhio* (2011) 51 Cal.4th 1074 [126 Cal.Rptr.3d 74, 253 P.3d 247] (*Maikhio*). There, a game warden—based upon a suspicion of illegal fishing out of season, and pursuant to the authority of Fish and Game Code section 2012—stopped the defendant's vehicle after having observed him fishing from a pier and having caught something. (*Maikhio*, at pp. 1078–1079.) The court held that in light of the fact that fishing and hunting are voluntary activities which are "heavily regulated" (*id.* at p. 1096), "anglers and hunters have a reduced reasonable expectation of privacy when engaged in such activity. [Citations.]" (*Id.* at p. 1097, fn. omitted.) In balancing the importance and strength of the state's interest and the need for the suspicionless stop procedure against the limited impingement on a person's rights, the court concluded that the state was not precluded from authorizing a warden to briefly stop a person in the field observed to have been recently fishing or hunting. (*Ibid.*)

*Maikhio* is obviously distinguishable. The activity here—riding a train—while voluntary, is not a "heavily regulated" one; it is hardly an activity in which the passenger surrenders a modicum of his or her reasonable expectation of privacy. Moreover, unlike in *Maikhio*—where the game warden had some evidence to support a suspicion of illegal fishing, and the record showed that his actions were motivated by a desire to protect the state's wildlife (*Maikhio, supra,* 51 Cal.4th at p. 1100)—here, there was nothing in the record indicating that Deputy Thrall suspected or had any reason to

suspect defendant of not having paid his fare, or that the deputy was motivated by a desire to ensure that passengers paid the required fare.[6]

Although the deputy's initial question of defendant concerned his fare, the record shows that this was a ruse to detain defendant. Deputy Thrall did not stop other passengers to ask for proof of fare. Instead, he singled defendant out after he exited the train. He approached defendant while he was on the platform, and asked defendant for proof of fare although the deputy did not have his citation booklet with him. Deputy Thrall detained defendant not to determine if he had paid his fare, but because he wanted to investigate whether defendant had been involved in a one-week-old sexual battery. Thus, even though—as urged by the Attorney General—an authorized officer may randomly check passengers to determine whether they have paid their fare without evidence supporting a reasonable suspicion of fare evasion, the detention here cannot be justified on that basis.

The case is analogous to the circumstances in *People v. Valenzuela* (1999) 74 Cal.App.4th 1202 [88 Cal.Rptr.2d 707] (*Valenzuela*). There, the defendant, a passenger in a taxicab, was convicted of cocaine possession after the cab was stopped by a police officer for the stated reason of conducting a taxicab inspection. (*Id.* at p. 1204.) In reviewing the denial of the defendant's suppression motion, the appellate court concluded that the stop of the taxicab for the purported reason of inspecting it was pretextual and that the true reason was the officer's investigation of the passenger's potential involvement in wrongdoing. (*Id.* at p. 1204.) While the *Valenzuela* court properly acknowledged that the subjective motivations of the arresting officer are not relevant where probable cause exists for finding a violation of the law (*id.* at p. 1207, citing *Whren v. United States* (1996) 517 U.S. 806, 813 [135 L.Ed.2d 89, 116 S.Ct. 1769]), the court concluded that the detention was unreasonable: "Here, the stop of the taxicab was not based on any criminal law violation. Instead, it arose from [the officer's] asserted purpose of conducting a cab inspection which, as discussed above, was a pretext for his true motive: to contact Valenzuela. Thus, the inapplicability of 'ordinary, probable-cause Fourth Amendment analysis' [citation] distinguishes this case from *Whren* and aligns it with the inventory and administrative search cases prohibiting pretextual police intrusions." (*Valenzuela*, at p. 1209; see *Delaware v. Prouse* (1979) 440 U.S. 648, 663 [59 L.Ed.2d 660, 99 S.Ct. 1391] [random stop of motorist to check driver's license and registration, where officer had no reasonable suspicion of wrongdoing, violated 4th Amend.].)

This is not a case in which an officer authorized to check passengers to determine whether they have paid their fare exercises that authority by

---

[6] During oral argument, the People conceded that there was no evidence that Deputy Thrall had a basis to suspect defendant of not having paid his fare.

randomly checking passengers for that reason. We therefore reject the Attorney General's contention that the detention was justified based upon Deputy Thrall's right to check whether defendant, as a light-rail passenger, had paid his fare. We will determine the legality of the stop based upon whether a reasonable suspicion existed of defendant's involvement in that sex crime. (See *In re Tony C., supra,* 21 Cal.3d at p. 897 [although officer thought minors might be truants, the express reason for stopping them was to investigate their possible involvement in recent burglaries].)

■ As noted, a court decides whether a temporary detention is lawful by evaluating "the totality of the circumstances." (*United States v. Cortez, supra,* 449 U.S. at p. 417.) The record demonstrates that Deputy Thrall, in his investigation of the prior sex crime, detained defendant here based upon the following: (1) the deputy's assessment that defendant "resembled one of the suspects" of the sexual battery occurring one week earlier; (2) defendant was on a train at the station where the subject crime had taken place; and (3) the station was located in "a high crime area, open area market for narcotic[s] sales." We address these circumstances, singly and collectively, below.

### 1. *Defendant's resemblance to suspects*

Although we review the totality of the circumstances, it is obvious from the record before us that the primary circumstance to be considered here is whether defendant's alleged resemblance to one or both of the suspects provided Deputy Thrall with a reasonable suspicion to detain defendant. We conclude that it did not.

We begin with the physical description of the suspects available to Deputy Thrall.[7] The deputy testified affirmatively in response to the question that he thought defendant "possibly resembled suspect one of the two suspects" identified in Detective Woo's e-mail.[8] And it is objectively clear that the

---

[7] Deputy Thrall testified that he could not recall whether he carried Detective Woo's e-mail and the attached suspect photographs with him while he was on patrol on the day he detained and arrested defendant.

[8] The Attorney General argues that defendant erroneously states in the opening brief that the deputy "never clarified whether he considered [defendant] to resemble the description of Suspect One or Suspect Two." It is true that Deputy Thrall on direct examination never specified which of the two suspects he believed defendant to resemble at the time he detained him. On cross-examination, he only testified in the affirmative to the question that he thought defendant "possibly resembled suspect one." This testimony is hardly unequivocal on the subject of whether the deputy in fact at the time of the detention definitively believed that defendant resembled Suspect One. Nonetheless, since the focus of our inquiry is whether the circumstances justified the detention, especially whether and to what extent a reasonable person in Deputy Thrall's position would have concluded that defendant resembled one or both of the suspects, the deputy's subjective belief, if any, as to which one of the two suspects

19-year-old, five-foot-10, 180-pound, well-groomed defendant could not have reasonably been considered to resemble Suspect Two—who was described as being a Black male in his 30's, unkempt (with body odor), and "approximately five[-]five, 195 [pounds]." There was some commonality between defendant and Suspect One, as described in Detective Woo's e-mail, namely, both were Black males. Additionally, the age of Suspect One ("approximately in his 20's") and his weight (195 pounds) were in the general range of defendant's (19 years old and 180 pounds, respectively). But there were significant differences between Suspect One and defendant. Suspect One was described as approximately six feet one inches tall, while defendant is five feet 10 inches tall. Deputy Thrall himself testified that defendant was "significantly shorter than" Moor's indicated height of six feet two inches. Further, Suspect One was described as "clean shaven, light complected, [and] appeared unkempt," while defendant is of medium to dark complexion, and at the time of the detention was well groomed and had a mustache and slight goatee.

Deputy Thrall also relied on the photographs attached to Detective Woo's e-mail. When the deputy observed defendant on the train, he decided to approach him after concluding, based upon having reviewed the photographs at the beginning of his shift eight hours earlier, that defendant particularly resembled one of the suspects in "[h]eight, weight, age, hairline from the photographs and the shape of his nose." Defendant argues that the photographs "are blurry, and details of the faces are impossible to discern." He argues further that the images of the faces are so poor that the suspects depicted in them "do not have discernible noses" and therefore "[i]t was objectively unreasonable for [Deputy] Thrall to base his suspicion of [defendant] on the resemblance of [defendant's] nose to the suspects' noses as depicted in those photographs." We have reviewed the photographs attached to Detective Woo's e-mail, as well as defendant's booking photograph, which photographs were introduced at the suppression hearing. We agree with defendant that the photographs of the suspects are of poor quality and offer little objective support for Deputy Thrall's testimony that he had an initial suspicion that defendant might have been involved in the prior sex crime.[9]

defendant more closely resembled is not germane to our analysis. (See *People v. Letner* (2010) 50 Cal.4th 99, 145 [112 Cal.Rptr.3d 746, 235 P.3d 62] [conduct is " ' "reasonable" ' " under 4th Amend., irrespective of officer's subjective mental state, if action is justified based upon objective view of circumstances].)

[9] Defendant suggests that this court should conduct an "independent" review of the photographic evidence, and the Attorney General argues that "it would be improper" for us to perform an "[i]ndependent review of a subset of the historical facts before the lower court." Neither party is correct. To the extent that defendant urges this court to perform an "independent" review of the evidence as a form of de novo review of the proceedings, he misstates our standard of review. (See pt. I., *ante.*) But if the Attorney General is suggesting that this court should not review the evidence considered by the trial court at all in deference

Specifically, we agree that the photographs provide such poor depictions of the suspects' faces that their noses are not (or, charitably, are barely) discernible. Further, comparing these photographs with defendant's booking photograph—one which Deputy Thrall testified was a fair and accurate depiction of defendant's appearance at the time of the arrest—there is no basis for concluding that defendant bore a close resemblance to either suspect. Thus, any opinion that Deputy Thrall held that defendant resembled one of the suspects in the photographs—whether based upon nose shape or otherwise—was not objectively reasonable.

Defendant relies in part on *Williams v. Superior Court* (1985) 168 Cal.App.3d 349 [213 Cal.Rptr. 919] (*Williams*). There, an officer stopped the petitioners, a motorist and his passenger (both Black males), ostensibly for failing to come to a complete stop at a stop sign, but never issued a traffic citation. (*Id.* at pp. 354–355, 356.) Before the infraction occurred, the officer decided to follow the petitioners because (1) as they passed the officer's patrol car, each turned his head and stared at the officer for approximately five seconds, which the officer thought was suspicious behavior (*id.* at pp. 353–354); and (2) he believed "that their ages and general physical appearance and that of their vehicle matched recent broadcasts of local robberies he had heard over the police radio," namely, a residential robbery by two Black men the night before and a one-week-old robbery of an auto parts store by two Black men (*id.* at p. 354). The appellate court held that the officer did not have an objectively reasonable suspicion that the petitioners were the suspects in the robberies and therefore the prolongation of the detention beyond the time necessary to cite the driver for the traffic violation was unjustified. (*Id.* at pp. 359–362.) In so holding, the court noted that the officer's belief that the petitioners might be the robbery suspects was based upon a recollection of the physical descriptions of the residential robbery suspects that was "materially distorted" (*id.* at p. 360), and his erroneous belief concerning the physical descriptions of the suspects in the two robberies could "not serve as a valid basis for suspecting persons who coincidentally meet the conglomerate description." (*Ibid.*)[10]

to its role as the factfinding tribunal, she is also mistaken. Part of this court's obligation in addressing defendant's claim of error is to determine whether there was substantial evidence to support the court's underlying express and implied findings of fact. (*People v. Lawler, supra*, 9 Cal.3d at p. 160.) Of necessity, this requires us to review the evidence here, including the photographs, to decide whether there was substantial evidence to support the court's factual findings. Most notably, the court's factual findings include that there was a close resemblance between defendant and one of the suspects as demonstrated in the photographic evidence, "coupled with how closely Defendant matched the physical description of the suspect." From these evidentiary findings, the court concluded that Deputy Thrall had a reasonable suspicion justifying detaining defendant.

[10] It was reported that the residential robbery suspects were a six-foot-three-inch, 25-year-old Black man weighing 249 pounds and a five-foot-nine-inch, 45-year-old Black man

■ *Williams* provides some support for defendant's claim that Deputy Thrall did not have a reasonable suspicion that defendant was a suspect in the week-old sex crime. Although there are obvious factual dissimilarities, in both cases, the suspects' physical descriptions were not a close match to the person(s) being detained. And in *Williams*, as is true here, there was a sense that the detaining officer relied too heavily on the common general traits of race and age in attempting to justify a stop that had no other circumstances to warrant it. (See, e.g., *People v. Bower* (1979) 24 Cal.3d 638, 644 [156 Cal.Rptr. 856, 597 P.2d 115] [person's race does not furnish reasonable suspicion for detention];[11] *People v. Hester* (2004) 119 Cal.App.4th 376, 388 [14 Cal.Rptr.3d 377] [decrying assumption that defendant, who was Black, was gang member because he was in car with another Black male known to be gang member, as "far too consistent with racial profiling to be constitutionally permissible"].)

■ Given the absence of a match between defendant and the physical descriptions or photographs depicting the suspects, Deputy Thrall's bases for connecting defendant to the one-week-old sexual battery were his race and age. But a number of courts have rejected the notion that reasonable suspicion for detaining someone may be based upon vague or general descriptions. (*In re Carlos M.* (1990) 220 Cal.App.3d 372, 381–382 [269 Cal.Rptr. 447] ["vague description does not, standing alone, provide reasonable grounds to detain all persons falling within that description . . ."].) For instance, in *In re Tony C., supra*, 21 Cal.3d at page 896, the arresting officer justified his initial detention of the minor and his companion, who were Black, because of suspected truancy and his awareness of several burglaries in the area the previous day in which " 'three male [B]lacks' " were the suspects. In holding that the detention was unlawful, the high court concluded that the officer "had been informed only that the suspects in the prior burglaries were 'three male [B]lacks' of unspecified ages. Such a vague description could not reasonably have led him to suspect these *two* [B]lack *minors* were the missing culprits. To hold otherwise would authorize the police to stop and question every [B]lack male, young or old, in an area in which a few [B]lack suspects were being sought. Such wholesale intrusion into the privacy of a significant portion of our citizenry would be both

---

weighing 150 pounds with a full beard. (*Williams, supra*, 168 Cal.App.3d at p. 357.) The officer recalled the suspects' descriptions as "mid-twenties; medium-to-above in height and weight; one man fully bearded." (*Id.* at p. 354.) The court observed that in concluding that the petitioners might be the robbery suspects, "[h]e selectively took off 20 years and a full beard from the description of one robber and reduced the 6-foot-3-inch, 249-pound robber to 'average-to-above-in-height-and-weight' to meet the general physical appearance of [petitioners]." (*Id.* at p. 360.)

[11] *People v. Bower, supra*, 24 Cal.3d 638, was abrogated on other grounds by constitutional amendment, as stated in *People v. Lloyd* (1992) 4 Cal.App.4th 724, 732–733 [6 Cal.Rptr.2d 105].

socially intolerable and constitutionally impermissible." (*Id.* at p. 898, fns. omitted.) Similarly here, the fact that two Black males, one of whom was in his 20's, were being sought for a prior daytime sexual battery at the station did not justify the detention of defendant, a Black male of the approximate age of one of the suspects, because he happened to be at the same train station at night one week later. (See *People v. Collins* (1970) 1 Cal.3d 658, 660 [83 Cal.Rptr. 179, 463 P.2d 403] [in which court expressed "grave doubts as to the lawfulness of" detention based upon the defendant's matching the general description of grand theft suspect thought to frequent the area, who was Black, six feet tall, and 160 pounds].)

### 2. *Defendant's presence at scene of prior crime*

The Attorney General argues that the trial court properly considered the fact that defendant exited a train at the station where the sexual battery occurred a week earlier in concluding that Deputy Thrall had a reasonable suspicion to detain defendant. She argues further that there was nothing improper about the court's having assigned significance to the fact that defendant was seen at this particular station because of the habits of persons of returning to locations they have previously visited. We disagree with the Attorney General's position and conclude that the fact that defendant was seen at the station where the sexual battery had occurred was of little or no significance in establishing reasonable suspicion for the detention.

We agree with defendant that the timing of the subject crime being investigated is important in assessing the significance of defendant's having been seen at the station where the crime occurred. Were defendant to have been seen at the station moments after the commission of the crime, his presence there, coupled with his sharing of some physical characteristics with Suspect One, might have had some relevance. But because one week had passed since the sexual battery and the station was an area in which one would expect a high volume of foot traffic and ridership, the fact that defendant, among other people, was seen at the station is inconsequential.[12]

One case, *People v. Durazo* (2004) 124 Cal.App.4th 728 [21 Cal.Rptr.3d 516] (*Durazo*), cited by defendant, emphasized the attenuation from the time

---

[12] There was no evidence below concerning the average daily number of riders at, or persons present in the vicinity of, the downtown light-rail station. Defendant cites to a VTA Web site for ridership information, presumably for the purpose of our taking judicial notice thereof, which we decline to do. Nonetheless, common sense suggests that because the area is a busy downtown metropolitan location in which people embark on and disembark from the light-rail daily, the sheer number of people present at the downtown light-rail station over a one-week period dilutes any importance that could attach to defendant's having disembarked there. (See *In re H.M.* (2008) 167 Cal.App.4th 136, 144 [83 Cal.Rptr.3d 850] [court views evidence objectively and "through the lens of common sense and experience" in determining whether officer had reasonable suspicion to detain minor].)

of the prior crime's commission as a factor indicating that reasonable suspicion did not exist for the detention. There, the basis for the stop was a college student's report that he had been threatened over the telephone by "unknown 'Mexican gang members,' " who stated they would come to his apartment at 6:00 a.m. the following morning. (*Id.* at p. 731.) Based upon an officer's observation four days later of two Hispanic males driving by the reporting witness's apartment and looking in its direction, he followed and ultimately stopped them, resulting in finding a loaded pistol for which the defendant was arrested. (*Id.* at p. 733.) The appellate court held that the detention was unlawful, concluding that there were insufficient facts to support a reasonable suspicion by the officer justifying that traffic stop. (*Id.* at pp. 735–738.) In so holding, the court distinguished two federal cases relied on by the People that also involved threats of violence. In those cases, the detentions occurred "at the very intersection where the police found" the defendant immediately after a 911 call (*id.* at p. 736, citing *U.S. v. Terry-Crespo* (9th Cir. 2004) 356 F.3d 1170, 1174), and within 30 minutes after the witness reported the threat (*Durazo*, at pp. 736–737, citing *Flowers v. Fiore* (1st Cir. 2004) 359 F.3d 24, 26–28). The *Durazo* court concluded that, as compared with the facts in *Terry-Crespo*, "[t]he circumstances in the instant matter were significantly more attenuated" (*Durazo*, at p. 736), and as compared with *Flowers*, "[a]lthough this case involves a similar type of threat, the immediacy of that threat was entirely lacking" (*id.* at p. 737). Likewise, here, the circumstances—where one week had passed since the commission of the crime being investigated, it had occurred in a very public metropolitan location, and there were no signature aspects to the crime that provided a close link to defendant—were significantly attenuated.[13]

### 3. *High-crime area*

The Attorney General emphasizes that defendant's detention occurred at the downtown "[l]ight [r]ail station that is an open-air drug market notorious to law enforcement . . . ." She asserts that "an officer would be expected to investigate someone resembling a sex assault suspect who gets off a light rail train at an open drug market where the assault actually had occurred." We

---

[13] Defendant correctly observes that there have been a number of cases in which an important factor in the courts' finding the existence of reasonable suspicion for the detention was the closeness in time between the reported crime and the stop. (See, e.g., *People v. Wells* (2006) 38 Cal.4th 1078, 1088 [45 Cal.Rptr.3d 8, 136 P.3d 810] [highway stop of motorist in blue van within two minutes of anonymous report of matching vehicle " 'weaving all over the roadway' "]; *People v. Harris* (1975) 15 Cal.3d 384, 387 [124 Cal.Rptr. 536, 540 P.2d 632] [stop in residential area within one-half hour of reported burglary of man matching general description of suspect]; *People v. Conway* (1994) 25 Cal.App.4th 385, 390 [30 Cal.Rptr.2d 533] [3:00 a.m. traffic stop of car leaving residential area less than two minutes after report of burglary in progress by two undescribed suspects where no one else on the street]; *People v. Lloyd* (1992) 4 Cal.App.4th 724, 733–734 [6 Cal.Rptr.2d 105] [4:00 a.m. detention of suspect standing next to business where "silent alarm had just been triggered"].)

disagree that the notoriety of the area of the detention here was a significant factor in justifying the detention.

█ It has been repeatedly held that the fact that the detainee happens to find himself or herself in a high-crime neighborhood is, of itself, insufficient to support a reasonable suspicion for a peace officer to stop that person. (*In re Tony C., supra,* 21 Cal.3d at p. 897; *People v. Pitts* (2004) 117 Cal.App.4th 881, 887 [12 Cal.Rptr.3d 91]; *People v. Medina* (2003) 110 Cal.App.4th 171, 177 [1 Cal.Rptr.3d 546].) As our high court has explained, "The 'high crime area' factor is not an 'activity' of an individual. Many citizens of this state are forced to live in areas that have 'high crime' rates or they come to these areas to shop, work, play, transact business, or visit relatives or friends. The spectrum of legitimate human behavior occurs every day in so-called high crime areas. As a result, this court has appraised this factor with caution and has been reluctant to conclude that a location's crime rate transforms otherwise innocent-appearing circumstances into circumstances justifying the seizure of an individual. [Citations.]" (*People v. Bower, supra,* 24 Cal.3d at p. 645; see *People v. Loewen* (1983) 35 Cal.3d 117, 124 [196 Cal.Rptr. 846, 672 P.2d 436].)

Deputy Thrall testified that the area was an "open area market for narcotic[s] sales." But the crime being investigated was a sexual battery, not a drug crime. And the fact that defendant disembarked from a train at a station located in what is considered to be a high-crime area, of itself, did not give the deputy a reasonable suspicion to detain him. Thus, absent evidence that there was a significant resemblance of defendant to one of the suspects—a showing which, as we have discussed, *ante,* was not made—defendant's presence in an "open area market for narcotic[s] sales" is not a noteworthy circumstance in the determination of whether Deputy Thrall had an objectively reasonable suspicion justifying his detention of defendant. (See *People v. Pitts, supra,* 117 Cal.App.4th at p. 887 [finding no reasonable suspicion where the defendant, who was suspected in one-month-old uncorroborated report of involvement in methamphetamine sales, was found in neighborhood of home suspected of being involved in methamphetamine sales; officer could not confirm why the defendant was in the area and did not "reduce[] the wide spectrum of possible explanations for Pitts's presence"].)

### 4. *Conclusion*

Deputy Thrall's decision to detain defendant was based upon (1) his assessment that he "resembled one of the [sexual battery] suspects," (2) defendant's presence at the scene of the one-week-old crime, and (3) the notoriety of the area itself. In considering "the totality of the circumstances" (*United States v. Cortez, supra,* 449 U.S. at p. 417), the facts presented here

were insufficient to "provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza, supra,* 9 Cal.4th at p. 231.) Deputy Thrall's basis for stopping defendant was at best impermissibly "predicated on mere curiosity, rumor, or hunch . . . ." (*In re Tony C., supra,* 21 Cal.3d at p. 893.)

■ "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen . . . . [Citations.] . . . The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. [Citations.] He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." (*Florida v. Royer* (1983) 460 U.S. 491, 497–498 [75 L.Ed.2d 229, 103 S.Ct. 1319]; see *People v. Bower, supra,* 24 Cal.3d at p. 648; see also *People v. Hughes* (2002) 27 Cal.4th 287, 328 [116 Cal.Rptr.2d 401, 39 P.3d 432].) Deputy Thrall had the right to approach defendant—as he would with any other citizen—to inquire if he was willing to answer some questions. In this consensual encounter, defendant had the right to refuse to answer those questions. Defendant, in effect, did so by initially responding to Deputy Thrall's question about proof of fare with his own question about why the deputy was singling him out. Although the deputy had the right to seek defendant's voluntary cooperation, absent a reasonable suspicion that defendant was involved in criminal activity, he could not compel that cooperation by detaining him.

■ The prosecution did not meet its burden of proof in justifying defendant's detention. (*People v. Bower, supra,* 24 Cal.3d at p. 644.) The court should have granted the motion to suppress. Defendant's arrest was premised on his having given a false name to Deputy Thrall after being detained, in violation of section 148.9. The statute criminalizes a person's false representation or identification of himself or herself to a peace officer "upon a lawful detention or arrest of [that] person . . . ." (§ 148.9, subd. (a); see *In re Voeurn O.* (1995) 35 Cal.App.4th 793, 797 [41 Cal.Rptr.2d 549] [§ 148.9 applies only where the false identification is given in connection with lawful detention or arrest, and does not apply to consensual encounters with police].) Since defendant's subsequent arrest for violating section 148.9 was based upon an unlawful detention, and the search incident to the arrest was likewise unlawful (see *Miller v. United States* (1958) 357 U.S. 301, 313–314 [2 L.Ed.2d 1332, 78 S.Ct. 1190] [suppression required of contraband seized after search incident to unlawful arrest]), we reverse and remand with directions to dismiss the cause.

## DISPOSITION

The order of probation is reversed, and the cause is remanded to the trial court with directions that it be dismissed.

Rushing, P. J., and Premo, J., concurred.

A petition for a rehearing was denied November 15, 2012, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied January 30, 2013, S206896.