Filed 4/18/16  P. v. Santos-Garcia CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JULIO SANTOS-GARCIA,<br><br>    Defendant and Appellant. | G050941<br><br>(Super. Ct. No. 13HF2920)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson, Judge.  Reversed.

William Paul Melcher, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Marilyn L. George and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A border patrol agent pulled over defendant's vehicle. The agent suspected defendant was either smuggling contraband or was an illegal immigrant based on the following facts: defendant's vehicle slowed significantly upon seeing the agent's vehicle; when the agent drove in the lane next to defendant and peered into defendant's vehicle, defendant acted nervously; defendant was driving on Interstate 5, which is frequently used by smugglers; and defendant's vehicle had entered Mexico three days earlier and had been sent to secondary inspection because the driver (not defendant) had a prior drug possession offense, though no contraband was found in the vehicle. After pulling defendant's vehicle over, defendant consented to a search of the vehicle, which turned up 47 pounds of methamphetamine. Defendant moved to suppress all evidence found in the search, arguing the agent had no reasonable suspicion to detain defendant. The court denied the motion.

Defendant pleaded guilty to one count of possession of a controlled substance for sale (Health & Saf. Code, § 11378; count 1), one count of sale or transportation of a controlled substance (Health & Saf. Code, § 11379, subd. (a); count 2), and admitted an enhancement pursuant to Health & Safety Code section 11370.4, subdivision (b)(4), that the substance in the charged offenses exceeded 20 kilograms by weight. He was sentenced to the low term of two years in the Orange County Jail on count 2, and 15 consecutive years on the enhancement. The court divided the sentence pursuant to Penal Code section 1170, subdivision (h)(5), requiring only five years of incarceration followed by 12 years of mandatory supervision.

Defendant appealed, contending the court erred in denying the suppression motion. The parties agree the consent was valid only to the extent the initial detention was valid. We conclude the agent did not have reasonable suspicion to detain defendant. Accordingly, we reverse the judgment.

FACTS

At the outset of the hearing on the suppression motion, the parties stipulated that defendant "was stopped, and that there was no search or arrest warrant in this case . . . ." The only witness at the hearing was United States Border Patrol (Border Patrol) Agent Edgar Sandoval.

Agent Sandoval is a K-9 handler for the Border Patrol and the United States Customs Border Protection who operates out of San Diego. He had served as a Border Patrol agent for approximately 14 years.

On September 25, 2013, Agent Sandoval was working in the area around San Clemente and Camp Pendleton on Interstate 5. Agent Sandoval described the "I-5 corridor" as "a major artery" for smuggling. "It is one of the major arter[ies] that leads from the United States-Mexico border to the interior of the United States. Through intelligence and through other means that are gained on the field, and, you know, through other agencies, it's known that smugglers traffic that route, take that route to further their narcotics, or whatever contraband they're taking, into the interior of the United States." He had made several previous arrests for drug smuggling in that corridor.

At approximately 11:00 a.m., Agent Sandoval had been assisting another agent with a vehicle inspection. As he was leaving the shoulder heading northbound, he had on his rear emergency lights, and was going slow in the number four lane so that he could see vehicles passing him. Although he was driving an unmarked Ford F-150, his rear emergency lights were red and blue "wig-wags" that make it obvious the vehicle is a law enforcement vehicle.

A blue GMC Suburban passed him in the number one lane and caught his attention because it slowed abruptly. He pulled alongside it and paced it at 50 miles per hour, which is below the speed limit. This caught Agent Sandoval's attention because it was "[n]ervous behavior. It's commonly seen overcompensation for following the law to

3

try to avoid attention by law enforcement personnel." At that point Agent Sandoval testified: "I want[ed] to make [it] evident . . . that I was looking at him or her. So I lowered my window, and I was wearing . . . a police vest [and] a radio that goes over my shoulder so it's very obvious . . . that I'm law enforcement personnel, . . . and I wanted to see his reaction to the fact I was looking at him, that he caught my attention." Defendant was driving the Suburban.

When defendant noticed Agent Sandoval looking at him, his posture became rigid, he changed his hand position on the wheel, and was generally tense. This reaction was consistent with what Agent Sandoval had seen from drug smugglers in the past. Also, defendant's tense posture combined with the vehicle's slow rate of speed concerned Agent Sandoval because "[t]hose are indicators . . . something could be wrong, something could be wrong with the vehicle, or something else was wrong. He was obviously nervous about something so I wanted to find out what it was."

Agent Sandoval then slowed and pulled behind the suburban to run a record check on the vehicle. Based on that search, Agent Sandoval discovered that the vehicle had crossed the Mexico border approximately three days earlier. At the border check point, the vehicle underwent a secondary inspection because the driver (not defendant) had a previous arrest for possession of dangerous drugs. Agent Sandoval did not know what the exact charge was. Nothing illegal was found in the vehicle.

Agent Sandoval testified that after discovering that information: "I, once again, pulled up next to him. And I made it very apparent that I was looking at him again. At this time he did not look at my direction but he continued driving in the same position that he was prior. He began to fidget with his glasses, and — he adjusted his glasses the same way throughout the time that I was following him, I would say approximately eight to nine times. And I recalled he had a coffee cup in the holder, which he would fix his glasses, grab the coffee, drink the coffee, put the coffee down. And he continued doing that straight, repetitive the whole time I was next to him." At

that point Agent Sandoval "felt that [he] wanted to effect a vehicle stop to conduct inspection of the vehicle. Or the subjects in the vehicle — subject in the vehicle." On cross-examination he clarified, "I believe there was illegal [activity] actively being conducted that's why I made the stop. I was unsure of what was going on, but I believe there was illegal activity taking place; had to be illegal immigration or smuggling." So he pulled defendant's vehicle over.

Agent Sandoval made contact with defendant and initially ran an immigration inspection on him. Defendant had a "B1 B2 Visa . . . , which is . . . a visitor's passport." Agent Sandoval asked defendant where he was going; defendant responded, "It's my friend's car." "I once again asked him where he was going, and he hesitated. He was initially thinking, he was very, very nervous, avoiding eye contact, and he told me he was going to the outlets." Agent Sandoval asked where the outlets were; defendant said San Juan Capistrano. Agent Sandoval was not familiar with any outlets in San Juan Capistrano. Agent Sandoval asked if defendant had currency for the outlets; defendant replied he did not but was going to pay with a card. Agent Sandoval asked if he had any narcotics or anything illegal; defendant replied he did not. "Then I asked him for consent to search the vehicle which he granted." Agent Sandoval also asked permission to use his dog, which defendant granted.

Agent Sandoval then sent his dog into the vehicle and it "was in alert the entire time. It appeared to be a lot of odor in the vehicle." "And he came to stop in the rear of the vehicle." "We opened the back doors of the suburban and a fellow agent noticed immediately this looks bul[k]y." The agents picked up the material and discovered a bundle that contained methamphetamine. They found a total of approximately 47 and one-half pounds of methamphetamine.

After Agent Sandoval's testimony, the court denied defendant's motion to suppress the evidence found as a result of the search: "The court does look at all of the factors in their totality. The fact that the abrupt sudden slow down of the vehicle

5

occurred after passing an unmarked vehicle with police lights, that the speed was slower than the speed of traffic, the repetitive nature of the adjusting the glasses and drinking the coffee, which appears to be a pronounced display of behavior that could be consistent with nervous behavior, coupled with the location of the driving, coupled with the fact that the vehicle is known to have crossed the border three days prior with an individual that was driving that had the prior drug activity, along with the location of the I-5 corridor, the statement — leaves the court to believe there was specific articulable facts to justify the detention." The court went on to find that consent to search the vehicle was properly obtained.

## DISCUSSION

Defendant contends the court erred in denying his motion to suppress evidence obtained from the search of the vehicle. A defendant is permitted to appeal a court's ruling on a suppression motion notwithstanding a subsequent guilty plea: "A defendant may seek further review of the validity of a search or seizure on appeal from a conviction in a criminal case notwithstanding the fact that the judgment of conviction is predicated upon a plea of guilty. Review on appeal may be obtained by the defendant provided that at some stage of the proceedings prior to conviction he or she has moved for the return of property or the suppression of the evidence." (Pen. Code, § 1538.5, subd. (m).)

"A warrantless search is presumed to be unreasonable, and the prosecution bears the burden of demonstrating a legal justification for the search. [Citation.] 'The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the

6

search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.'" (*People v. Redd* (2010) 48 Cal.4th 691, 719.)

"In California, issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards." (*People v. Rogers* (2009) 46 Cal.4th 1136, 1156, fn. 8.) "The Fourth Amendment protects against unreasonable searches and seizures. [Citations.] 'A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity.' [Citation.] Ordinary traffic stops are treated as investigatory detentions for which the officer must be able to articulate specific facts justifying the suspicion that a crime is being committed." (*People v. Hernandez* (2008) 45 Cal.4th 295, 299.) "[O]fficers are not entitled to rely on mere hunches." (*Ibid.*) However, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" (*United States v. Arvizu* (2002) 534 U.S. 266, 273.) "Although an officer's reliance on a mere '"hunch"' is insufficient to justify a stop, [citation], the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard [citation]." (*Id.* at p. 274.) "[A] subjective suspicion is not required. The reasonable suspicion necessary to justify a detention is measured *solely* by an objective standard." (*People v. Lloyd* (1992) 4 Cal.App.4th 724, 733.)

Defendant contends that his consent to Agent Sandoval searching the vehicle was valid only if the initial detention was valid; the People do not dispute the point. Indeed, as our high court has said, "Where, as here, the prosecution relies on consent to justify a warrantless search or seizure, it bears the 'burden of proving that the defendant's manifestation of consent was the product of his free will and not a mere

7

submission to an express or implied assertion of authority. [Citation.]' [Citation.] Consent that is the product of an illegal detention is not voluntary and is ineffective to justify a search or seizure. [Citations.] Where an illegal detention occurs, unless 'subsequent events adequately dispel the coercive taint of the initial illegality, i.e., where there is no longer causality, the subsequent consent is' ineffective." (*People v. Zamudio* (2008) 43 Cal.4th 327, 341.) The People do not contend that, assuming the detention was illegal, the taint of that illegality was subsequently dispelled. Rather, the People simply contend the initial detention was legal.

Agent Sandoval essentially relied upon three articulable facts in detaining defendant. First, defendant was nervous around a law enforcement officer. The abrupt slowing, the changed posture, the fidgety behavior, all demonstrated that defendant was nervous. Second, the vehicle was driving along Interstate 5, which drug smugglers frequently use to smuggle drugs into the United States. Third, the car had previously been stopped and searched at the border, with nothing being found, although the driver had some form of drug possession arrest on his record. Notably, Agent Sandoval did not state he detained defendant for a traffic violation, and the People do not argue that a traffic violation justified the detention.

It has been repeatedly held that nervous behavior, by itself, does not give rise to reasonable suspicion that crime is afoot. "Nervousness in the presence of a police officer does not furnish a reasonable basis for a detention . . . . [Citation.] As [the California Supreme Court] has observed, '[t]o hold that police officers should in the proper discharge of their duties detain and question . . . all those who act nervous at the approach of officers would for practical purposes involve an abrogation of the rule requiring substantial circumstances to justify the detention and questioning of persons on the street.'" (*People v. Loewen* (1983) 35 Cal.3d 117, 125.) Agent Sandoval's conduct here — pulling alongside defendant's vehicle twice and glaring at him — would make most people nervous. "Failure to meet the border agent's gaze, and kneading of the

8

steering wheel, even if indicative of nervousness, does not provide a sufficient reason to suspect defendant was in the country illegally or doing anything else illegal. [Citation.] Anyone — undocumented aliens, legal resident aliens, or citizens alike — could easily be apprehensive of a series of forced encounters with uniformed authority figures." (*People v. Valenzuela* (1994) 28 Cal.App.4th 817, 828.) As another court noted, "it is a common, if not universal, practice for drivers and passengers alike to take note of a law enforcement vehicle coming up behind them. In fact, the most law-abiding of citizens frequently adjust their driving accordingly." (*United States v. Montero-Camargo* (9th Cir. 2000) 208 F.3d 1122, 1136.)

On the other hand, nervousness can be a contributing factor in combination with other circumstances to support reasonable suspicion. For example, in *People v. Letner and Tobin* (2010) 50 Cal.4th 99 (*Letner*), the court held that nervous behavior, such as the slow driving involved here, was relevant. In *Letner* the defendants were pulled over based on the following facts: "When Officer Wightman first observed the Ford Fairmont at the intersection of Main and Garden Streets, its exterior, unlike other cars traveling in the area, was beaded with water, although it had stopped raining hours before. A reasonable officer could suspect from this circumstance that the car had been parked nearby until fairly recently. Officer Wightman knew that in the immediate area were a number of car dealerships that had reported vehicle tamperings, burglaries, and thefts in the preceding months. Indeed, the Ford dealership adjacent to that intersection had reported the theft of a vehicle approximately one week earlier. It was midnight on a Tuesday night, when relatively few persons are working or otherwise away from home and hence when vehicle thefts from a car dealership more readily might be committed. Officer Wightman, following the Fairmont in his marked patrol car, observed that after the vehicle entered the highway (at that point a freeway), it accelerated to a speed of only 40 miles per hour, well below the speed limit, and traveled at that speed for approximately one mile, that is, for more than one minute. In these circumstances, a

9

reasonable officer might suspect the driver of the car was attempting to avoid contact with the police." (*Id.* at p. 147) In support of that conclusion, the *Letner* court quoted federal decisions for propositions such as, "'noticeable deceleration in the presence of a patrol car can contribute to reasonable suspicion, even though drivers often slow when they see law enforcement personnel'" (*id.* at p. 219), and "'maintaining a noticeably slow speed in the presence of a police officer may suggest nervousness . . . .'" (*Id.* at p. 220; *but see U.S. v. Hernandez-Alvarado* (9th Cir. 1989) 891 F.2d 1414, 1419 ["[M]any law-abiding motorists have two-way antennas installed on their cars, live near the Mexican border, and reduce their speed on the freeway when being followed by a law enforcement vehicle. Thus, these facts in combination do not constitute reasonable suspicion"].)

The question, then, is what is the something extra in addition to nervous behavior that created reasonable suspicion here? The People rely on two factors: defendant's presence on Interstate 5, and the fact that the vehicle had crossed the border three days before. We conclude neither circumstance carries significant weight.

To be sure, courts have held that a person's presence in a high crime area is a significant factor in a reasonable-suspicion analysis. "An area's reputation for criminal activity is an appropriate consideration in assessing whether an investigative detention is reasonable under the Fourth Amendment." (*People v. Souza* (1994) 9 Cal.4th 224, 240.) This factor, however, has traditionally been treated with caution: "It has been repeatedly held that the fact that the detainee happens to find himself or herself in a high-crime neighborhood is, of itself, insufficient to support a reasonable suspicion for a peace officer to stop that person." (*People v. Walker* (2012) 210 Cal.App.4th 1372, 1391.) "The 'high crime area' factor is not an 'activity' of an individual. Many citizens of this state are forced to live in areas that have 'high crime' rates or they come to these areas to shop, work, play, transact business, or visit relatives or friends. The spectrum of legitimate human behavior occurs every day in so-called high crime areas. As a result, [the California Supreme Court] has appraised this factor with caution and has been

10

reluctant to conclude that a location's crime rate transforms otherwise innocent-appearing circumstances into circumstances justifying the seizure of an individual." (*People v. Bower* (1979) 24 Cal.3d 638, 645, superseded by statute on other grounds as stated in *People v. Lloyd*, *supra*, 4 Cal.App.4th 724, 733.)

There is no evidence here that Interstate 5 near San Clemente is a high crime area. There was no evidence, for example, that drivers on Interstate 5 are more likely to be involved in criminal activity than on other freeways. There was testimony that drug smugglers frequently use Interstate 5 to transport drugs. But Interstate 5 is not exactly a back alley — *many* people drive Interstate 5 near San Clemente every day, and presumably the vast majority of them do so for lawful purposes. Defendant's presence on Interstate 5, therefore, did not contribute to reasonable suspicion that crime was afoot.[1]

The second plus-factor the People suggest is that defendant's vehicle had crossed the Mexico border three days earlier and the vehicle had been searched because the driver had some form of drug possession arrest on his record. But, although the vehicle crossed the border and was searched, no contraband was found. That fact tends to negate reasonable suspicion rather than support it. Further, the parties have not cited, nor have we found, any case holding that a recent *legal* border crossing is a factor contributing to reasonable suspicion that crime is afoot. We are not prepared to hold that every nervous driver who recently crossed the border is subject to warrantless detentions.

---

[1] Defendant filed a request for judicial notice (and the People filed opposition) requesting that this court take judicial notice that "in 2013, between 199,500 and 219,000 vehicles traveled on average on the northbound I-5 freeway at Avenida Pico in San Clemente, California each day." We deny that portion of the motion because the source materials defendant provided do not appear to be relevant to that alleged fact (it appears defense counsel included the wrong pages). However, we accept as common knowledge that Interstate 5 in that area sees high daily vehicle traffic. Defendant also requested we take judicial notice that "the distance between Avenida Pico in San Clemente, California, and the international border at San Ysidro, California, is approximately 75 miles." We grant the motion as to that fact.

11

Nor is reasonable suspicion created by the fact that a prior driver of the vehicle had an unspecified drug possession arrest (not conviction) at an unspecified time in the past. Reasonable suspicion is judged by an objective standard, and thus any subjective mistake Agent Sandoval may have made about defendant being the one with the prior arrest is irrelevant. Moreover, the scant information Agent Sandoval had about the prior arrest was not suggestive that crime was afoot when defendant was detained. If, for example, the driver had a prior drug smuggling conviction, or other specific intelligence had connected the driver with smuggling, this may have supported reasonable suspicion. But given the dearth of information available to Agent Sandoval, the driver's record did not support reasonable suspicion.

Agent Sandoval did not have reasonable suspicion to detain defendant. He had a hunch. His hunch turned out to be correct, but the law is clear that "officers are not entitled to rely on mere hunches." (*People v. Hernandez, supra,* 45 Cal.4th at p. 299.) Accordingly, the court erred in denying defendant's motion to suppress.

DISPOSITION

The judgment is reversed.

IKOLA, J.

WE CONCUR:

ARONSON, ACTING P. J.

THOMPSON, J.

12