SIMONS, J.
Following a series of robberies in August and September 2012, a San Francisco police officer reviewed police reports of the crimes and surveillance video of eight of them before arresting defendants and *568 appellants Bryan Alexander and Ray Farr.[1] Alexander and Farr subsequently pled guilty to several of the offenses. In the published portion of this opinion we reject appellants' contention the trial court erred in denying their motion to suppress evidence discovered pursuant to their warrantless arrest. We conclude, among other things, the trial court properly admitted the officer's testimony that the videos helped provide probable cause for appellants' arrest. We reject appellants' arguments this testimony constituted hearsay, relied on unauthenticated writings and violated the secondary evidence rule. Further, we determine the information possessed by the officer was sufficiently reliable to justify the arrest. In the unpublished part of this opinion, we reject appellants' claim the trial court erred in calculating conduct credits, and we remand to the trial court to exercise its discretion regarding whether to strike a five-year sentence enhancement imposed on Alexander based on a prior serious felony conviction.
BACKGROUND
In April 2017, appellants were charged in a first amended information with 14 counts of second-degree robbery ( Pen. Code, § 211 );[2] nine counts of second-degree burglary (§ 459); and one count of receiving stolen property (§ 496, subd. (a)). Farr was charged with two additional counts of second degree robbery; one additional count of second degree burglary; one count of making a criminal threat (§ 422); and one count of assault with force likely to cause great bodily injury (§ 245, subd. (a)(4)). The information also alleged that Alexander had suffered three prior prison terms (§ 667.5, subd. (b)) and one prior violent or serious felony conviction (§ 667), and the information alleged that Farr had suffered six prior prison terms (§ 667.5, subd. (b)).
Prior to the filing of the amended information, Alexander moved under section 1538.5 to suppress evidence discovered pursuant to the warrantless arrest of himself and Farr, and Farr joined in the motion. In June 2016, following a hearing, the trial court denied the motion.
In May 2017, pursuant to a negotiated disposition, Alexander pleaded guilty to three counts of robbery (counts 12, 23, and 26) and admitted a prior conviction for attempted robbery and one prior prison term. Farr pleaded guilty to two counts of robbery (counts 5 and 14) and admitted four prior prison terms.[3]
In June 2017, in accordance with the plea bargain, the trial court sentenced Alexander to 14 years in prison, consisting of four years on count 12, two years on count 23, two years on count 26, five years for the prior conviction of attempted robbery (§ 667, subd. (a)(1)), and one year for the prior prison term.[4] Alexander was given credit for time served of 2,002 days, consisting of 1,741 days in jail and 261 days of conduct credit. The trial court sentenced Farr to 10 years in prison, consisting of *569 five years on count five, one year on count 14, and one year for each of the four prison priors. Like Alexander, Farr was given credit for time served of 2,002 days, consisting of 1,741 days in jail and 261 days of conduct credit.
Both Alexander and Farr appealed.
DISCUSSION
I. The Trial Court Did Not Err in Denying Appellants' Motion to Suppress
The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ...." ( U.S. Const., 4th Amend.) Under section 1538.5, subdivision (a)(1)(A), a defendant may move to suppress evidence on the ground that a "search or seizure without a warrant was unreasonable." "A warrantless search is presumed to be unreasonable, and the prosecution bears the burden of demonstrating a legal justification for the search. [Citation.] 'The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' " ( People v. Redd (2010) 48 Cal.4th 691, 719, 108 Cal.Rptr.3d 192, 229 P.3d 101.)
" '[A] warrantless arrest by a law [enforcement] officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed.' " ( People v. Thompson (2006) 38 Cal.4th 811, 817, 43 Cal.Rptr.3d 750, 135 P.3d 3.) " 'Probable cause exists when the facts known to the arresting officer would persuade someone of "reasonable caution" that the person to be arrested has committed a crime.' " ( Id. at p. 818, 43 Cal.Rptr.3d 750, 135 P.3d 3.) Where an officer makes a warrantless arrest based on a belief they have probable cause to do so, "the officer must testify to the facts or information known to him on which his belief is based" because "the court and not the officer must make the determination whether the officer's belief is based upon reasonable cause." ( People v. Boyles (1955) 45 Cal.2d 652, 656, 290 P.2d 535.) The prosecution bears the burden of proving the reasonableness of a warrantless arrest. ( People v. Williams (1999) 20 Cal.4th 119, 130, 83 Cal.Rptr.2d 275, 973 P.2d 52.)
The central issue on appeal is whether the arresting officer's testimony regarding the robbery surveillance videos was admissible and sufficient to establish probable cause for the warrantless arrest of appellants.
A. Sergeant Maguire's Testimony at the Hearing on the Motion to Suppress
San Francisco Police Sergeant Thomas Maguire investigated a series of 10 robberies in August and September 2012. The suspects were two African-American males, one taller and thinner than the other. Maguire obtained police reports regarding all of the incidents and surveillance videos of eight of the incidents. He viewed and compared the videos multiple times. Maguire testified about his investigation of seven of the robberies.
First, a robbery was reported on August 19, 2012, at the San Bruno Cafe. Another police officer, Sergeant Discenza, gave Sergeant Maguire a surveillance video, saying it came from the cafe robbery. The video showed a single robber in a leather jacket. Maguire identified two photographs *570 as stills from the video, admitted as exhibits 1 and 2.
Second, a robbery was reported on August 26, 2012, at a Round Table Pizza on Mission Street. Sergeant Maguire responded to the scene, interviewed witnesses, and viewed surveillance video that showed two African-American male suspects commit a robbery as described by the witnesses. One suspect was taller and thinner than the other. Maguire believed one of the two suspects was also the perpetrator of the San Bruno Cafe robbery.
Third, a robbery was reported on August 28, 2012, at a business called Underdog on Irving Street. Sergeant Maguire went to the location and watched a surveillance video, which showed a sole robbery suspect.
Fourth, a robbery was reported on September 7, 2012, at a Burger King. Sergeant Maguire responded to the scene and watched a surveillance video that showed two African-American male suspects, one taller and thinner than the other. Maguire believed they were the same two suspects he had seen in the video from the Round Table robbery. The shorter and heavier suspect was wearing a brown long-sleeved shirt and black shoes with white soles. Maguire identified two photographs as stills from the video, admitted as exhibits 4 and 5.
Fifth, a robbery was reported on September 10, 2012, at a business called "Uniqlo Services" on Ocean Avenue. Sergeant Maguire obtained the police report and surveillance video. The video showed two African-American male suspects, one taller and thinner than the other. Maguire identified one photograph as a still from the video showing a person who he believed to be the shorter suspect, admitted as exhibit 6. He was wearing black shoes with white soles, like those worn by the shorter suspect in the Burger King robbery.
Sixth, a robbery was reported on September 11, 2012, at a business called "The Hot Tubs" on Van Ness Avenue. Sergeant Maguire obtained the police report and surveillance video of the incident and went to the scene the day after the robbery. The video showed two African-American male suspects, one taller and thinner than the other. Maguire identified four photographs as stills from the video, admitted as exhibits seven through ten. Exhibits seven and eight showed the shorter suspect wearing a dark-colored beanie cap and black shoes with white soles. Exhibits nine and ten showed the taller suspect, who had "scruffy" facial hair and was wearing a hooded sweatshirt.
Seventh, a robbery was reported on September 14, 2012, at a Subway shop on Polk Street. Sergeant Maguire read the police report and viewed the surveillance video that was collected in the investigation. He also went to the scene and spoke to people who described the incident. The shop looked the same as it did on the video, and the witnesses' description of the robbery matched what he saw in the video. The video showed two African-American male suspects, one taller and thinner than the other. Maguire identified two photographs as stills from the video, admitted as exhibits 11 and 12.
Sergeant Maguire arrested appellants on September 16, 2012. At 5:54 p.m. on that day, he heard a broadcast reporting a robbery at a restaurant called "Sweet Chinito" on Mission Street. The suspects were described as two African-American men, one taller and one shorter. Maguire thought they might be the perpetrators in the robberies he was investigating.
After hearing the broadcast about the Sweet Chinito robbery, Sergeant Maguire went to the area of 7th Street and Market Street, because the dispatch said the victim's *571 cell phones were stolen and stolen cell phones are often sold in that location. He arrived in the general area in an unmarked vehicle about 20 minutes after the broadcast and observed two men cross the street about 12 feet in front of him. He "immediately recognized" them as the suspects in the robberies he had been investigating. Both were African-American, and one was taller and thinner than the other. Maguire noticed the shorter man was wearing black shoes with white soles similar to those he had seen in several videos, as well as a leather jacket which resembled one worn by the suspect in the San Bruno Cafe robbery video. The shorter man's height, weight, build, face, and demeanor also resembled one of the suspects. The taller man was wearing dark pants and boots that resembled clothes worn by a suspect in the videos, and his facial features (including facial hair) and confident manner were similar to a suspect in the videos. Maguire identified Alexander as the shorter man and Farr as the taller man he observed on September 16, 2012.
Sergeant Maguire called for backup, followed appellants for a short distance, and then exited his vehicle and apprehended them at gunpoint. Maguire searched a black bag Farr was carrying and found two cell phones. Maguire asked an officer at the Sweet Chinito restaurant to call the phones that had been stolen, and the phones recovered by Maguire rang. Another officer found car keys on Alexander that were connected to a white Chevy that looked like the getaway car in one of the robbery videos. Maguire searched the vehicle and found a black replica handgun and a dark-colored beanie cap.
Sergeant Maguire identified five photographs of appellants taken on September 16, 2012, admitted into evidence as exhibits 13 through 17.
B. The Trial Court's Ruling
Appellants sought an order suppressing all evidence obtained as a result of the warrantless arrest. After argument from counsel, the trial court denied the motion to suppress. The court said it credited Sergeant Maguire's testimony that "he immediately recognized [appellants] as the suspects whom he had viewed on multiple times in multiple videotapes of prior and relatively recent robbery incidents." The court further found that some of the stills from the videos corroborated Maguire's testimony. Although the quality of the images varied, the court observed that the photos of the San Bruno Cafe robbery (exhibits one and two) were "fairly recognizable depictions" of Alexander, and the photos from the robbery at The Hot Tubs (exhibits nine and ten) were "pretty well recognizable depictions" of Farr.[5] The court concluded Maguire had probable cause to arrest appellants.
C. Admissibility of Sergeant Maguire's Testimony About the Robbery Videos
Appellants contend the prosecution below failed to prove the surveillance videos that Sergeant Maguire described actually depicted the robberies he was investigating. More narrowly, they contend the prosecution failed to meet its burden on that point because Maguire's testimony connecting the videos to the robberies was based on hearsay. As appellant Alexander puts it, "no person with personal *572 knowledge of any incident testified that the video watched by Maguire accurately depicted it, and no person with personal knowledge testified how any incident was video recorded or how any video watched by Maguire was generated."
In arguing that Sergeant Maguire's testimony about the surveillance videos was inadmissible, appellants correctly observe that the hearsay rule was applicable during the hearing on the motion to suppress. (See Hewitt v. Superior Court (1970) 5 Cal.App.3d 923, 927, 85 Cal.Rptr. 493 [in reference to hearings on motions to suppress, stating " Evidence Code section 300 makes it clear that, except as otherwise provided by statute, the Evidence Code applies to every evidentiary hearing in the state courts...."]; Jauregi v. Superior Court (1999) 72 Cal.App.4th 931, 940, 85 Cal.Rptr.2d 553 [in the context of forfeiture proceedings, stating "Accordingly, because no statute exists which exempts such an evidentiary hearing from the application of the Evidence Code, all Evidence Code provisions which deal with hearsay apply ..."].)
Appellants then proceed to argue that Sergeant Maguire's assertions that the surveillance videos he viewed corresponded to the robberies under investigation was based on inadmissible hearsay. Appellants' contention is misplaced. It is true that Maguire's testimony was not based on his personal knowledge. Instead, his belief that the videos depicted the robberies was based on information received from witnesses to the robberies and other officers, based on the videos being associated with the cases in police records, or based on receiving the videos from the victims. However, "[i]t is settled ... that reasonable cause to justify an arrest may consist of information obtained from others and is not limited to evidence that would be admissible at the trial on the issue of guilt." ( People v. Boyles , supra , 45 Cal.2d at p. 656, 290 P.2d 535, citing Brinegar v. United States (1949) 338 U.S. 160, 171-176, 69 S.Ct. 1302, 93 L.Ed. 1879.)
More to the point, Sergeant Maguire's testimony was not subject to exclusion under the hearsay rule because, even though it was based on (mostly implied) extra-judicial statements, the testimony was not hearsay because it was offered only to show the information he relied on in deciding to arrest appellants. ( Evid. Code, § 1200.) As explained in People v. King (1956) 140 Cal.App.2d 1, 5, 294 P.2d 972, "In each of the instances objected to by the appellant the extra-judicial statements were offered in evidence not to prove the truth of the matter asserted, but to establish probable cause to effect the search and seizure. The truth of the information given to [the officer] was not in issue, nor was it offered in evidence to prove any element of the offense against the appellant. The evidence in question was offered solely to establish that the officer had reasonable or probable cause to effect the search and seizure." (See also Cantrell v. Zolin (1994) 23 Cal.App.4th 128, 132-133, 28 Cal.Rptr.2d 238 [in context of administrative hearing following arrest for vehicular offense, extrajudicial statement of officer about driver's conduct "was relevant to the issue whether [the arresting officer] had reasonable cause to believe plaintiff had been driving under the influence" and "it was not hearsay because it was not offered to prove the truth of the matter stated"]; People v. Magana (1979) 95 Cal.App.3d 453, 462, 157 Cal.Rptr. 173 [an informant's statement is "being offered to establish that the affiant had a reasonable basis for believing the informer's statement to be true-whether in fact true or not-to justify the magistrate's finding of probable cause."]; Cal. Criminal Law (Cont.Ed.Bar 2017) Procedure and Practice, *573 § 16.20, p. 421 ["Testimony offered only on the issue of probable cause, which would be hearsay if offered for the truth of the matter asserted, is not hearsay. For example, if a police officer testifies to the reported description of an alleged robber, the testimony is not admitted to prove that the robber was as described; it is offered to show that the officer has probable cause to detain, search, or arrest the defendant."]; cf. People v. Lucero (1998) 64 Cal.App.4th 1107, 1110, 75 Cal.Rptr.2d 806 [observing that the testimony deemed admissible in King is inadmissible as irrelevant " '[if] the legality of defendant's arrest was not in issue' "].)[6]
In the present case, Sergeant Maguire's testimony about how he obtained the surveillance videos and what he observed in the videos was not admitted to prove the videos depicted the robberies or to prove the content of the videos. Instead, the testimony was admitted to inform the trial court of the basis for Maguire's belief he had probable cause to arrest appellants. As explained below (Part I.D., post ), the prosecution was required to show that information was sufficiently reliable to support an objectively reasonable finding of probable cause.
Appellants also contend the prosecution failed to demonstrate the surveillance videos that Sergeant Maguire described were authentic within the meaning of Evidence Code section 1400, which provides that "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (See also People v. Goldsmith (2014) 59 Cal.4th 258, 266-267, 172 Cal.Rptr.3d 637, 326 P.3d 239 ( Goldsmith ).) Video recordings are writings within the meaning of Evidence Code section 1400. ( Goldsmith , at p. 267, 172 Cal.Rptr.3d 637, 326 P.3d 239.) Goldsmith explains that "[a]uthentication is essentially a subset of relevance," because a writing cannot be treated as relevant to the issues in an action without some proof the writing is what it is purported to be. ( Ibid. )
Although the prosecution was required to authenticate the videos Sergeant Maguire described in his testimony, "the proof that is necessary to authenticate a photograph or video recording varies with the nature of the evidence that the photograph or video recording is being offered to prove and with the degree of possibility of error." ( Goldsmith , at p. 267, 172 Cal.Rptr.3d 637, 326 P.3d 239.) Goldsmith further explains, "The purpose of the evidence will determine what must be shown for authentication, which may vary from case to case. [Citation.] The foundation requires that there be sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered." ( Ibid. ) "A photograph or video recording is typically authenticated by showing it is a fair and accurate representation of the scene depicted. [Citations.] This foundation may, but need not be, supplied by the *574 person taking the photograph or by a person who witnessed the event being recorded. [Citation.] It may be supplied by other witness testimony, circumstantial evidence, content and location." ( Id. at pp. 267-268, 172 Cal.Rptr.3d 637, 326 P.3d 239.)
In Goldsmith , the evidence at issue were photographs generated by a red light traffic camera, "offered as substantive proof of defendant's violation." ( Goldsmith , supra , 59 Cal.4th at p. 267, 172 Cal.Rptr.3d 637, 326 P.3d 239.) The authenticity of the photographs was supported in part by a statutory presumption that printed representations are " 'presumed to be an accurate representation of the images it purports to represent.' " ( Id. at p. 268, 172 Cal.Rptr.3d 637, 326 P.3d 239, quoting Evid. Code, § 1553, subd. (a).) The showing of authenticity was also supported by testimony from an officer who explained the operation of the camera system, based on information he obtained from city engineers and the company that maintained the camera. ( Goldsmith , at pp. 264, 271, 172 Cal.Rptr.3d 637, 326 P.3d 239.) Further, "the content of the photographs themselves may be considered and here the content supplied further support for a finding that the images were genuine." ( Id. at p. 271, 172 Cal.Rptr.3d 637, 326 P.3d 239.)
In the present case, Sergeant Maguire's testimony about the surveillance videos was only admitted for the purpose of establishing the information he relied on in arresting appellants.[7] With that purpose in mind, we turn to the prosecution's showing of authenticity. Sergeant Maguire testified under oath about surveillance videos of seven robberies. Maguire did not have personal knowledge of the robberies or how the videos were made, but there is little reason to doubt the videos depict the robberies under investigation. Although the testimony was not detailed, Maguire explained, or it can reasonably be inferred, that he obtained the videos from other officers, from case files, or from the establishments that were robbed. That the surveillance videos came from the robbery case files or were obtained from the locations of the robberies is circumstantial evidence that the videos depict the robberies under investigation. (See People v. Smith (2009) 179 Cal.App.4th 986, 1002, 102 Cal.Rptr.3d 177 [authenticity determination based in part on location of documents in defendant's office]; People v. Gibson (2001) 90 Cal.App.4th 371, 383, 108 Cal.Rptr.2d 809 [authenticity determination based in part on discovery of documents in search of defendant's home]; People v. Olguin (1994) 31 Cal.App.4th 1355, 1373, 37 Cal.Rptr.2d 596 [same].) As to the Round Table and Subway robbery surveillance videos, Maguire testified the events depicted in the videos matched the descriptions of *575 the incidents he heard from witnesses. Thus, the "content" ( Goldsmith , supra , 59 Cal.4th at p. 268, 172 Cal.Rptr.3d 637, 326 P.3d 239 ) of those two videos corresponded to the robberies. The specific evidence authenticating those videos was "circumstantial evidence" ( ibid. ) that corroborated the authenticity of the other videos, which appeared to have been committed by the same suspects during the same time frame. Photographs of stills from five of the videos were submitted into evidence; those images contained timestamps corresponding to the dates of the robberies[8] and corroborated Maguire's testimony by showing the videos he described did in fact exist. In other words, "the content supplied further support for a finding that" the videos depicted the robberies under investigation. ( Id. at p. 271, 172 Cal.Rptr.3d 637, 326 P.3d 239.) To conclude the videos did not correspond to the robberies, one would need to speculate that persons provided videos of other robberies to Maguire or that the videos were an elaborate fabrication. The implausibility of those scenarios reflects the low "degree of possibility of error" in the present case. ( Id. at p. 267, 172 Cal.Rptr.3d 637, 326 P.3d 239.) Whether or not Maguire's testimony would have been sufficient to authenticate the videos for admission at trial on the underlying charges (see fn. 7, ante ), his testimony was a sufficient "prima facie" showing of authenticity for purposes of the hearing on the motion to suppress. (Ibid. )
Appellants also argue their counsel were ineffective in failing to object to Sergeant Maguire's testimony under Evidence Code section 1523, which provides that "oral testimony is not admissible to prove the content of a writing."[9] However, an objection on the basis of that section, an aspect of the secondary evidence rule, would have been misplaced, because Maguire's testimony was admitted to explain the basis for the arrests, not to prove the content of the videos. (Cf. People v. Myers (2014) 227 Cal.App.4th 1219, 1226 & fn 1, 174 Cal.Rptr.3d 447 [testimony at robbery trial that video showed that store clerk raised his hands offered to show use of fear].) In any event, defense counsel might have had a tactical reason to avoid invoking Evidence Code section 1523. ( People v. Mendoza Tello (1997) 15 Cal.4th 264, 266-267, 62 Cal.Rptr.2d 437, 933 P.2d 1134.) To wit, defense counsel may have preferred to avoid admission of the surveillance videos, which might have demonstrated even more clearly the objective reasonableness of the arrest. Without the videos themselves, the showing of reasonableness could only be based on Maguire's testimony and the stills from the videos, which were less conclusive than the videos would have been, assuming (as we must for purposes of the claim on direct appeal [see ibid. ] )
*576 that appellants were the perpetrators in the videos.
Appellants have not shown the court erred in admitting the testimony of Sergeant Maguire at the hearing on the motion to suppress.[10]
D. Sergeant Maguire's Testimony Established Probable Cause
Did the information possessed by Sergeant Maguire support a finding of probable cause to arrest appellants? " 'Probable cause to arrest exists if facts known to the arresting officer would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that an individual is guilty of a crime.' [Citation.] '[T]he probable-cause standard' ... 'is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.' [Citation.] ' "[T]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt," ' and 'the belief of guilt must be particularized with respect to the person to be searched or seized....' [Citation.] In determining whether probable cause to make an arrest existed, 'we examine the events leading up to the arrest, and then decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause....' " ( People v. Turner (2017) 13 Cal.App.5th 397, 404-405, 220 Cal.Rptr.3d 449.) To support a determination of probable cause, the information relied upon by the arresting officer must be " 'reasonably trustworthy' " ( Hunter v. Bryant (1991) 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 ) or bear "indicia of reliability" ( Illinois v. Gates (1983) 462 U.S. 213, 233, 103 S.Ct. 2317, 76 L.Ed.2d 527 ).
As explained previously in the context of the authentication analysis (Part I.C., ante ), Sergeant Maguire's testimony established the videos were a trustworthy basis upon which to formulate probable cause for arrest. Although his testimony was not detailed, the videos as described had sufficient indicia of reliability and there is little reason to doubt the videos depicted the robberies under investigation. We need not repeat the analysis here.
Appellants also argue Sergeant Maguire could not make a sufficiently reliable identification of them based on his viewings of *577 the surveillance videos. They rely on People v. Walker (2012) 210 Cal.App.4th 1372, 152 Cal.Rptr.3d 424, in which the court of appeal held that a deputy's opinion that the defendant, detained at a public transit station, resembled a suspect was not "objectively reasonable." ( Id. at p. 1387, 152 Cal.Rptr.3d 424.)[11] Walker is distinguishable. There, the only similarities were in the race and age of the defendant and the suspect, because the photographs of the suspect relied upon by the deputy were "of poor quality and offer little objective support for [the deputy's] testimony." ( Id. at p. 1386, 152 Cal.Rptr.3d 424.) In the present case, we agree with the trial court that, comparing the surveillance stills to the photographs taken the day of the arrest, exhibits one and two are reasonably recognizable as Alexander and exhibits nine and ten are reasonably recognizable as Farr. Although the quality of the surveillance video stills is not so good as to leave no doubt, we agree with the trial court that it is reasonable to infer that Maguire's ability to recognize appellants was enhanced by his multiple viewings of the videos. Also, the circumstances that Maguire encountered appellants together and that Alexander was wearing the same jacket and shoes he wore in some of the videos substantially enhanced the probable accuracy of the identification. Considered as a totality, the information known to Maguire was sufficient; certainty in the identification was not required to support a determination of probable cause. ( People v. Turner , supra , 13 Cal.App.5th at pp. 404-405, 220 Cal.Rptr.3d 449.)
Appellants also contend the trial court, in upholding the warrantless arrest, could not rely on Sergeant Maguire's testimony about the Sweet Chinito robbery broadcast. They rely on the " Harvey - Madden rule,"[12] pursuant to which, when " ' "officers in the field ... make arrests on the basis of information furnished to them by other officers," ' " then " ' "the People must prove that the source of the information is something other than the imagination of an officer who does not become a witness." ' " ( People v. Collins , supra , 59 Cal.App.4th at p. 993, 69 Cal.Rptr.2d 544 ; see also People v. Brown (2015) 61 Cal.4th 968, 983, 190 Cal.Rptr.3d 583, 353 P.3d 305 ( Brown ).) We need not address that claim because, like the trial court, we do not rely on the dispatch in finding probable cause for the warrantless arrest. As we have explained, Maguire had probable cause to arrest appellants because he recognized them from the surveillance videos; his testimony about the Sweet Chinito robbery dispatch merely explained why he went to the area of Market and 7th Street the day of the arrest.
Because the surveillance videos viewed by Sergeant Maguire bore indicia of reliability and because those videos provided a sufficient basis for him to recognize appellants, the warrantless arrest of appellants was objectively reasonable under the Fourth Amendment.[13]
*578 II.-III.**
DISPOSITION
The trial court's judgment is affirmed as to appellant Farr. As to appellant Alexander, the case is remanded for the trial court to consider whether to strike the five-year enhancement imposed under section 667, subdivision (a)(1). If the trial court decides not to strike the enhancement, it is directed to correct the abstract of judgment to reflect that the enhancement is pursuant to section 667, subdivision (a)(1), rather than section 667.5, subdivision (a). The clerk of the superior court is ordered to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. The judgment as to appellant Alexander is affirmed in all other respects.
I concur.
JONES, P.J.

By separate order this court has consolidated appellants' appeals for purposes of argument and decision.

All undesignated statutory references are to the Penal Code.

The facts of the robberies to which appellants pleaded guilty are not relevant on appeal.

The abstract of judgment in Alexander's case incorrectly describes the five-year enhancement under section 667, subd. (a)(1) as being under section 667.5, subd. (a), which does not provide for a five-year enhancement. We will direct that the abstract of judgment be corrected on remand.

The trial court, going from its memory, referenced exhibit numbers "10 and 11, or perhaps 11 and 12," but it is clear the court meant exhibits 9 and 10, which clearly depict the same person at the same robbery-exhibits 10 and 11 depict two different robberies and exhibits 11 and 12 depict two different people.

King is cited with approval in another First District decision, People v. Romeo (2015) 240 Cal.App.4th 931, 946-947, 193 Cal.Rptr.3d 96, although the decision describes the testimony at issue there as admissible hearsay, rather than as admissible non-hearsay. (See ibid. ["The pertinent hearsay exception here is Evidence Code section 1250, subdivision (a)(1), the state-of-mind exception. Under that exception, Officer Miller's testimony that he obtained information from the database was admissible to prove his receipt of information from an independent source."].) That may be due to the fact that in Romeo the legality of the search depended on the actual scope of a probation search condition, rather than a determination of probable cause.

We need not decide whether a greater showing of authenticity would be required to admit the videos as substantive evidence at trial, because the videos were relevant to the probable cause determination if they bore indicia of reliability (see Part I.D., post) , even if (for some unlikely reason) the videos did not actually depict the charged robberies. (Cf. Goldsmith, supra , 59 Cal.4th at pp. 265-266, 271-272, 172 Cal.Rptr.3d 637, 326 P.3d 239 [authentication of images from red light traffic camera at court trial on citation for running red light]; People v. Chism (2014) 58 Cal.4th 1266, 1304, 171 Cal.Rptr.3d 347, 324 P.3d 183 [authentication of photographs from surveillance video at murder and robbery jury trial].) People v. Collins (1997) 59 Cal.App.4th 988, 994, 69 Cal.Rptr.2d 544, and People v. Romeo, supra , 240 Cal.App.4th 931, 193 Cal.Rptr.3d 96, upon which appellant Alexander relies, are also distinguishable. The searches in those cases were based upon a warrant ( Collins ) and a probation search condition ( Romeo ) , and the validity of the searches turned on evidence of the existence and scope of the warrant and search condition, rather than a probable cause determination based on the information possessed by the officer. (Collins , at p. 994, 69 Cal.Rptr.2d 544 ; Romeo , at p. 952, 193 Cal.Rptr.3d 96.)

The one exception is exhibits 7 through 10, which depict the robbery at The Hot Tubs. That robbery occurred on September 8, 2012, but the timestamps say September 9. Although the discrepancy is unexplained, that does not undermine the fundamental reliability of the video, given the unlikelihood robberies occurred on two consecutive days. The name "The Hot Tubs" is visible in exhibit seven, so there is no question the video came from that business. Further, even if it were true that robberies occurred at The Hot Tubs on two consecutive days, this would not reduce the relevance of the surveillance video in creating probable cause to arrest the perpetrators of the robbery shown in the video.

We reject appellant Farr's suggestion that his counsel did object on the ground of Evidence Code section 1523. The portion of the record cited by Farr does not indicate that counsel "fairly apprise[d]" the trial court of an objection under that provision or that court "understood [that] issue [to be] presented." (People v. Scott (1978) 21 Cal.3d 284, 290, 145 Cal.Rptr. 876, 578 P.2d 123.)

Appellant Farr also contends the trial court erred in limiting his counsel's cross-examination of Sergeant Maguire. Specifically, his counsel asked Maguire to re-confirm details about the suspects in the surveillance videos, such as that they were "two African-American males, one taller and thinner, and the other shorter and heavier." The prosecutor objected, saying "asked and answered as to these specific videos." The trial court sustained the objection, commenting "It is. Let's move things something along. If there's nothing new to add here or if there's some area or cross-examination that's going to be helpful to me. But it doesn't help me to hear the same testimony over and over again." Later, the court stated, "I think I've heard enough on re-cross from this witness," and Farr's counsel responded, "That's fine." Farr has not shown error. "The control of cross-examination is not only within the discretion of the trial court, but, in the exercise of that discretion, the court may confine cross-examination within reasonable limits and may curtail cross-examination which relates to matters already covered or which are irrelevant." (People v. Beach (1983) 147 Cal.App.3d 612, 628, 195 Cal.Rptr. 381.) The court told counsel she could explore any new areas and only indicated a desire not to hear the same testimony "over and over." Counsel's comment ("[t]hat's fine") in acquiescing to ending cross-examination indicates she had nothing left of significance to ask Maguire. The court did not abuse its discretion. (See People v. Ayala (2000) 23 Cal.4th 225, 301, 96 Cal.Rptr.2d 682, 1 P.3d 3 ["the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance."].)

Appellant Alexander's citations to cases regarding testimony at trial identifying a person in a photograph or video as the defendant are inapposite to the probable cause issue in this case. (People v. Larkins (2011) 199 Cal.App.4th 1059, 1065-1066, 131 Cal.Rptr.3d 911 ; People v. Mixon (1982) 129 Cal.App.3d 118, 127, 180 Cal.Rptr. 772.)

People v. Harvey (1958) 156 Cal.App.2d 516, 319 P.2d 689 and People v. Madden (1970) 2 Cal.3d 1017, 88 Cal.Rptr. 171, 471 P.2d 971.

The result in this case is consistent with the underlying objectives of the probable cause standards. As explained in Brinegar v. United States, supra , 338 U.S. at page 176, 69 S.Ct. 1302, the standards "seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable [people], acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."

See footnote *, ante .