Filed 2/23/24  P. v. From CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PAUL RICHARD FROM,<br><br>    Defendant and Appellant. | D081103<br><br><br>(Super. Ct. No. SCN434168) |

APPEAL from a judgment of the Superior Court of San Diego County, Michael D. Washington, Judge.  Affirmed.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant appeals from a judgment following a conviction on one felony count of failing to register as a sex offender in violation of section

290.018, subdivision (b), of the Penal Code[1] and one misdemeanor count of giving false information to a peace officer in violation of section 148.9, subdivision (a).  As to each offense, he argues the conviction should be reversed because there was no substantial evidence to support a necessary element of the offense, and because the trial court prejudicially erred in instructing the jury.  The Attorney General disagrees, and so do we.  Hence we affirm the convictions.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Defendant's 1993 Convictions and His Ensuing Incarceration*

In 1993 defendant was charged with five counts of child sex abuse: three under section 288.5, subdivision (a); and two under section 288, subdivision (a).  Each count was described in a charging document (the 1993 charging document) that included the following notification repeated five times, once for each count:  "NOTICE:  Conviction of this offense will require you to register pursuant to Penal Code section 290.  Willful failure to register is a crime."

By the time defendant was arraigned, the five counts had been whittled down to just the three based on section 288.5, subdivision (a).  A jury convicted defendant on these three counts, and there followed a lengthy period of incarceration.

### B.  *Defendant's 2022 Release on Parole, His Failure to Register, and His Re-arrest*

In January 2022, the Department of Corrections and Rehabilitation released defendant on parole.  Four months later, on May 19, 2022, two police officers encountered defendant at a motor home he had acquired following his

---

[1]     All statutory references in this opinion are to the Penal Code.

release. They instructed him to relocate the motor home because it was parked on private property. In response to their questions, defendant said that his name was Steve Oliver Graff, he was not on parole, and he had never been arrested. But their investigation indicated otherwise, and the encounter resulted in his arrest on a warrant for violating parole and providing false information to a peace officer.

## C.   *The Trial*

Following the events described above, defendant was tried on the two counts set forth above.[2]

At trial, the prosecution presented testimony from a correctional counselor, a parole agent, and a parole services associate—each of whom had met with defendant in the months leading to his release on parole, and each of whom recounted pre-release discussions they had had with him about requirements associated with registering as a sex offender. The prosecution also presented testimony from one of the officers who had arrested defendant in 2022, from a detective, and from a fingerprint expert. The defendant presented testimony from one witness—himself.

---

[2]   Section 290.018, subdivision (b), which is the basis for count one, states: "Except as provided in subdivisions (f), (h), (i), and (k), a person who is required to register under the [Sex Offender Registration Act (§ 290 et seq.)] based on a felony conviction . . . who willfully violates any requirement of the act . . . is guilty of a felony and shall be punished by imprisonment in the state prison for 16 months, or two or three years."

Section 148.9, subdivision (a), which is the basis for count two, states: "Any person who falsely represents or identifies himself or herself as another person or as a fictitious person to any peace officer listed in Section 830.1 or 830.2, or subdivision (a) of Section 830.33, upon a lawful detention or arrest of the person, either to evade the process of the court, or to evade the proper identification of the person by the investigating officer is guilty of a misdemeanor."

### 1. Evidence Relating to Defendant's Identity and to the Legality of His Conviction

Defendant's testimony revolved in large measure around the topic of his identity and, in particular, his assertion that he is not who the records in this case or in the 1993 case say he is. He acknowledged the existence of a minute order that had issued following his arraignment in the 1993 case that indicated he had "state[d] his true name is Paul Richard From." But he testified at trial that he had said no such thing: "I did not state that;" in fact "I made a big, big scene about that." "There was a requirement to stipulate that I was Paul From and the biological relative of everybody there," even though "the DNA proved I was not" and even though "I objected that I was not related and [a]m not Paul From." Rather, "I was born . . . Steve Oliver Graff."[3] But "they went ahead and stipulated [in the 1993 case] that I was Paul From;" and, "for 30 years, I've been forced to answer to that" name.

Defendant bristled, not only at these circumstances, but also at other "stuff . . . [he] had been fighting . . . from the very beginning," including, for example: the fact that the 1993 charging document does not bear the signature of a judge; and the fact that the numbering of the counts set forth in that document does not match the numbering of counts set forth in a 1993 sentencing minute order.[4] Based on "fraudulences" such as these, defendant asserted on direct examination that "I was not legally convicted." Pressed on cross-examination with the question, "So you are a convicted sex offender?"

---

[3] From testified that, "about a half a year before [being] arrested" in 1993, he "was given a name that was Paul Richard From."

[4] Whereas the three counts based on section 288.5, subdivision (a), are numbered I, IV, and V in the 1993 charging document, they are numbered I, II, and III in the 1993 sentencing minute order.

he answered: "According to [the 1993 sentencing minute order], yes." But "[a]ccording to what I know, no."

## 2. Evidence Relating to Defendant's Belief as to Whether He Was Required to Register as a Sex Offender

The prosecution and the defense in the present case stipulated at trial that "Penal Code section 288.5 requires lifetime registration as a sex offender" and that "[t]his was the law in 1993 and it remains the law today," and the trial court read this stipulation to the jury and took judicial notice accordingly. But defendant nonetheless testified that, for a variety of reasons, he had believed otherwise. That is, he said he had believed he was under *no* obligation to register. Among the reasons he cited for this belief were the fact that: he had no recollection of having ever been ordered to register; records on which he claimed he had relied—including, for example, an abstract of judgment and the 1993 sentencing minute order—included no mention of an obligation to register; and, in his mind's eye, he had not been legally convicted. (See *ante.*)

It was for reasons such as these, defendant testified, that he refused in August 2021 to read through a five-page form entitled Notice of Sex Offender Registration Requirement when the afore-mentioned correctional counselor presented it to him. This form included 27 separately enumerated paragraphs describing obligations of persons required to register as sex offenders and, next to each of the 27 paragraphs, a space for an inmate to affix his initials. By way of example, paragraph 6 stated: "I must register in person . . . within five (5) working days of . . . release from incarceration . . . with the law enforcement agency having jurisdiction over my place(s) of residence or where I am physically present as a transient. (Pen. Code, § 290)."

5

The signature block for this document stated:

> "I have been notified of my duty to register as a sex offender pursuant to Pen. Code, §§ 290-290.024 and 290.01. I have read or had read to me, and initialed each registration requirement specified on pages 2, 3, and 4 of this form. I understand it is my duty to know the registration requirements . . . . I understand failure to comply with the registration requirements . . . is punishable as a criminal offense.

> "(NOTE: THIS FORM DOES NOT COMPLETE YOUR DUTY TO REGISTER. UPON RELEASE FROM INCARCERATION OR RELEASE INTO SUPERVISION, YOU MUST REGISTER IN PERSON WITHIN FIVE (5) WORKING DAYS TO COMPLETE THE REGISTRATION PROCESS.)"

Defendant did not sign or initial any part of this form. Instead, he handwrote on the signature line, immediately below the passage quoted above: "The before court 'AMENDED INFORMATION' is NOT SIGNED, therefore FRAUDULENT"[5] and added the initials "P.F."

Two months later, in October 2021, defendant participated in a three-way meeting with the parole agent (via videoconference) and the parole services associate (in person). The parole agent testified that, during this meeting, he reviewed "line by line" with defendant each condition set forth on a six-page document entitled Special Conditions of Parole. One of these conditions stated: "You shall register as a Penal Code 290 sex offender registrant and comply with all registration requirements pursuant to Penal

---

[5] We presume the words "amended information" were intended to refer to the 1993 charging document, which (as noted *ante*) does not bear the signature of a judge.

6

Code 290 through 290.015." The parole agent testified that his line-by-line review of the conditions with defendant proceeded as follows:

> "A. I went down for each parole condition and after each one, I'd ask Parolee From if he understood and he acknowledged, and I would just keep going. And then I'd momentarily ask him, do you understand so far the parole conditions? He would say, yes. And then I would keep going.

> "Q. I want to direct your attention to Penal Code Section 290, special condition, on Page 3 of this form. Can you tell us how that conversation went when you reviewed this particular condition with the defendant?

> "A. Yes, ma'am. I went over California Penal Code parole conditions, which addresses [the] duty [to] register as a sex offender[,] and Parolee From did confirm his understanding of him having to register as a sex offender.

> "Q. How did he confirm his understanding?

> "A. Verbally and physically.

> "Q. What do you mean by verbally?

> "A. Verbally he said yes and then he nodded his head."

In somewhat similar fashion, the parole services associate testified that, when she had met with defendant earlier that same day, she too reviewed the sex offender registration requirement with him:

> "Q. Can you please describe for the jury your conversation with the defendant regarding the special conditions of parole?

> "A. [I explained] that he had to follow . . . these conditions. And then I emphasized, basically like I do with everybody else, that's it's very important if there are minors involved, to not have contact with any minors. And then, so also victims, do not contact any of your victims. No communication, no contact at all with your victims of crime, which is very important. And then the most important rule, and I always emphasize that

7

one, is the registration. You have five working days to register, to go to a law enforcement agency to register as a sex offender.

"Q. Why do you emphasize that?

"A. Because that's one of the conditions, if they violate, it can bring them back to prison.

"Q. When you told the defendant that, how did he respond, if anything?

"A. I don't really recall his reaction, but I do remember reviewing those with him.

"Q. Did he indicate to you that he didn't understand?

"A. No."

The defendant's description of these meetings agreed in some respects, and differed in other respects, from the descriptions furnished by the correctional counselor, the parole agent, and the parole services associate. According to defendant, the correctional counselor was very polite, the parole services associate was hostile, and the parole agent was yelling so loudly that "his voice was . . . distorted" and "you couldn't understand what he was saying." Nevertheless, defendant acknowledged on cross-examination: that he had been aware at the time of the August 2021 meeting with the correctional counselor that he *might* have an obligation to register but had chosen not to read the document; and that he had been told at the October 2021 meeting with the parole agent and the parole services associate that in fact he *was* obligated to register:

"Q. You knew at the time [of the August 2021 meeting with the correctional counselor] that you needed to register; correct?

"A. No, I did not. I did not read that far into that. I did not read that. I assumed there's a possibility of that, but that was not what I read. I was looking at the fraudulent stuff.

8

"[¶ . . . ¶]

"Q. [The parole agent with whom you met in October 2021] told you that you had to register as part of your parole condition?

"A. I – yes."

### 3.  Evidence Relating to Defendant's Encounter with the Police Officers Who Arrested Him in 2022

As noted above, during his encounter with the police in 2022, defendant identified himself as Steve Oliver Graff, said he was not on parole, and claimed he had never been arrested.  He also told the officers that he had a valid driver's license.  When one of the officers asked him to supply identification in the form of a driver's license or social security number, he said "that is all packed."  Then, after one of the officers expressed a concern that defendant was acting in a seemingly evasive manner, defendant furnished a different explanation for his inability to produce identification: "I've never had a Social Security number. . . .  I was born without a birth certificate, because I was born in a house."  When the other officer asked defendant if he had "ever given a false name," defendant said:  "No."  Then the conversation continued:

Q.  "Were you born under a different name or anything like that?

A.  "Uh, that's a high likelihood because I, I, I escaped from a cult a long time ago.

Q.  "Okay, so what was your birth name?

A.  "I don't, I was always called Steve Graff."

(All of these statements were captured using a body-worn camera that one of the officers was wearing that day.)

At trial, defendant testified that, in making these remarks to the officers, he was not "trying to be evasive."  He said that Steve Oliver Graff

9

*was* his actual name, that he had reverted to using that name on several occasions following his release from prison and prior to the day of his encounter with the officers, and that he had done so on the orders of correctional officers:

> "A. One [guard] said to disappear and the other said to get lost. The one said, 'Do not look back.' I've been hearing that for a long time, 'Don't look back, ignore anything in your past. You start a new life. Start over. Don't look back. Pretend it never happened.'
>
> "[¶ . . . ¶]
>
> "A. When I was . . . being released [from prison], I was told not to use Paul From. . . I was told use the name you grew up with and the name I grew up [with] was Steve Graff. I grew up with that until I got thrown in prison."
>
> "[¶ . . . ¶]
>
> "Q. You never told the officer that one of the names that you go by is Paul Richard From; correct?
>
> "A. I never said that because that was what I was ordered not to say when I was leaving prison."

Defendant also cited such statements by correctional officers as a reason for his not having registered as a sex offender. When asked, "Why didn't you make any plans to register," he answered, "I had no plans at all because I was told often before leaving and upon leaving . . . [to] forget everything."

> "I was going specifically by what I was told upon being released, to forget about everything from today past.
>
> "[¶ . . . ¶]
>
> "And that's what I did.
>
> "[¶ . . . ¶]
>
> "I forgot about everything from the bad days past. That's why I went forward and started a new life. I was told to

10

start a new life. And that's exactly what I did. I forgot about it. And anything that was mentioned by [the probation agent] that I was supposed to register, he's the only one that said anything, if there was anything. Like I said, I was very confused with the yelling. I had not—I just went from there, is what I was told to do."

As for his lack of identification, defendant testified he had never had a birth certificate or social security number and had been in the process of attempting to obtain those forms of identification and a driver's license at the time of the encounter with the officers. He also testified about various challenges he had encountered in navigating technology, finances, government services, housing, and health issues during the period between his release from prison and his re-arrest.

### 4. Further Evidence Relating to Defendant's Identity

The prosecution presented two witnesses who furnished testimony about fingerprints. The first such witness was the arresting officer, who testified that, after an initial investigation had revealed no record of a Steve Graff or of the license number that defendant had provided, he and his fellow officer arranged for a digital fingerprint scanner to be brought to the site of the encounter.

Q. And after the defendant's fingerprints were scanned, what did it reveal?

A. It came back with the name of Paul From, and it revealed that he was a parolee at large, and that he had a felony no-bail warrant.

The second witness who testified about fingerprints was a fingerprint expert. She testified that she and a second fingerprint expert had compared fingerprints that had been taken from defendant in connection with this case against fingerprints that had been taken from the accused in the 1993 case, and that each expert had independently concluded that the prints from the

11

two different cases "belong to one and the same source," meaning "they're all the same person."

## 5. Jury Instructions, Verdict, and Sentence

At the conclusion of the trial, the jury found defendant guilty on both counts, and found prior strike allegations to be true. Thereafter, the trial court sentenced defendant to a term of incarceration of six years, and defendant timely appealed.

## II.

## DISCUSSION

As to each count, defendant contends his conviction should be reversed because (1) there was no substantial evidence to support a necessary element of the offense; and (2) the trial court prejudicially erred in instructing the jury. We begin with the first of these two contentions.

## A. *Sufficiency of the Evidence*

In considering a contention that a record lacks substantial evidence on which to convict, we apply "the basic principles which govern judicial review of a criminal conviction challenged as lacking evidentiary support." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) That is, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—i.e., evidence that is reasonable, credible, and of solid value—on which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Ibid.*)

With regard to count one, defendant correctly argues that a person cannot be guilty of the offense of failing to register as a sex offender in violation of section 290.018, subdivision (b), unless his failure to register is willful, and to be willful, the defendant must have *known* he was obligated to register. (See *People v. Garcia* (2001) 25 Cal.4th 744, 752-754 (*Garcia*) ["in order to willfully violate" the statute, "the defendant must actually know of

12

his duty to register"].)  Here, he contends, the record is lacking in substantial evidence that he knew he was obligated to register.

As to count two, defendant correctly argues that a person cannot be guilty of the offense of giving false information to a peace officer in violation of section 148.9, subdivision (a):  (1) unless he has been lawfully detained or arrested by the officer (cf. *People v. Walker* (2012) 210 Cal.App.4th 1372, 1392 ["section 148.9 applies only where the false identification is given in connection with lawful detention or arrest, and does not apply to consensual encounters with police"]; *In re Voeurn O.* (1995) 35 Cal.App.4th 793, 797); (2) unless he has falsely identified himself to the officer; and (3) unless his purpose in falsely identifying himself was to evade court process or proper identification by the officer.  Here, he contends, "[t]here was no substantial evidence . . . that appellant was lawfully detained," "that appellant knowingly and intentionally provided a fake name," or "that he did so in order to avoid the court process or to avoid presenting proper identification."

But, notwithstanding defendant's correct statements of the *law*, we find, in our review of the record, plentiful *evidence* that is reasonable, credible, and of solid value on which the jury could conclude that the prosecution's burden on the challenged elements had been satisfied beyond a reasonable doubt.

Focusing first on the elements challenged with regard to count one, multiple correctional and parole personnel testified that they had informed defendant, in the months leading up to his release from prison, that he had a duty to register, and defendant *himself* acknowledged having been informed of this duty by at least one of those personnel (the parole agent).  "Although notice alone does not satisfy the willfulness requirement, a jury may infer from proof of notice that the defendant did have actual knowledge, which

13

*would* satisfy the requirement." (*Garcia, supra,* 25 Cal.4th at p. 752.) Moreover, the jury was at liberty to reject as self-serving and not credible defendant's testimony that he did not understand or believe the information that these persons had conveyed to him. So, too, was it at liberty to reject an inference that defendant truly believed the information these persons had conveyed to him must yield to his grievances regarding the 1993 conviction, to the absence of a reference to such a duty on those of the records of his 1993 conviction on which he says he chose to rely, or to correctional officers' casual remarks about forging a new life.

As for count two, we have no difficulty discerning, from the elements of the record described above, evidence that was reasonable, credible, and of solid value supporting a conclusion that defendant had been lawfully detained, that his name was Paul Richard From, and that he was trying to conceal that fact from the officers when he told them during his detention that his name was Steve Graff. In his encounter with the officers, defendant made a series of assertions—about a cult, identification records, his arrest history, his parole status, and his name—each of which could reasonably be characterized as unusual, ostensibly evasive, contradictory, or at odds with law enforcement records that the officers consulted during the encounter or with fingerprints taken during the encounter. These assertions, especially when juxtaposed against the law enforcement records and fingerprints, generated a reasonable suspicion on the part of the officers—and sufficed to warrant a conclusion on the part of the jury—that information defendant had provided to the officers, and continued to provide to the officers, was false and that defendant's purpose in providing false information was to evade arrest

14

on the outstanding felony warrant.[6]  Hence there was substantial evidence on which to conclude the challenged elements had been established.

The jury, moreover, could have found not only that aspects of defendant's testimony were implausible, but that such implausible aspects were mutually reinforcing, such that disbelief as to an aspect of defendant's testimony bearing on count one might undercut the jury's view of his credibility when testifying about count two, and vice versa.  Such evidence also could have been viewed by the jury, not only as implausible or mutually reinforcing, but as revealing consciousness of guilt.

## B.   *Instructional Error*

As an additional assignment of error, defendant contends his convictions are tainted by instructional error.  Specifically, he contends as to count one that the court should have given an instruction on the defense of mistake of law, and as  to count two that the court should have instructed the jury that the prosecution must prove defendant had been lawfully detained or arrested.  As to each of these contentions, our review is de novo.  (See *People v. Koenig* (2020) 58 Cal.App.5th 771, 806 (*Koenig*) ["We review a trial court's refusal to give a requested defense instruction de novo."]; *People v. Serrano* (2022) 77 Cal.App.5th 902, 909 [" 'The independent or de novo standard of review is applicable in assessing whether [jury] instructions correctly state the law.' "].)

---

[6]     During the encounter with the officers, and throughout trial, defendant repeatedly maintained he was Steve Graff and not Paul From.  Indeed, even after the officers expressed suspicion about his identity and twice told him "you're not free to leave," defendant doubled down by insisting "I was *always* called Steve Graff" (italics added)—despite his subsequent testimony at trial that, "for 30 years, I've been forced to answer to" the name Paul From.

15

With regard to the first of these two contentions, we begin by noting that " '[m]istake of law can be a valid defense when the crime requires specific intent if the mistake of law negates the specific intent of the crime' " (*Koenig, supra,* 58 Cal.App.5th at p. 806) and that a trial court is obligated to instruct a jury on that defense if (as here) the defense is consistent with the defendant's theory of the case and supported by substantial evidence. (*People v. Urziceanu* (2005) 132 Cal.App.4th 747, 775.) However, "a defendant is entitled to a mistake of law instruction *only* 'if the evidence supports a reasonable inference that any such claimed belief [as to what the law did or did not require] was held in good faith.' " (*Koenig,* at p. 808; italics added.) Hence the "instruction is properly refused if circumstances ' "indicate that although defendant may have 'believed' he acted lawfully, he was aware of contrary facts which rendered such a belief wholly unreasonable, and hence in bad faith." ' " (*Ibid.*)

In this case, the evidence that defendant says required the trial court to instruct the jury on mistake of law consists of (1) what defendant describes as his testimony that he "had never been ordered or instructed by a judge that he would be required to register pursuant to Penal Code section 290" and (2) his testimony that the abstract of judgment (which, per the testimony of the correctional counselor, is a type of document on which "prisoners regularly rely") and the 1993 sentencing minute order were silent on the topic of registration.

This evidence, such as it is, arguably supports a mistake of law defense; and so, too does defendant's testimony to the effect that correctional officers instructed or ordered him to "forget everything" and leave the past behind. But it is not evidence of a quantum or character that can fairly be said to be *substantial* (i.e., reasonable, credible, and of solid value). In this regard,

16

defendant's testimony did include a statement arguably to the effect that no judge had ever told him he would be required to register.[7] But it also included a statement to the effect that he *had no recollection,* one way or the other, as to whether a judge had told him that.[8] And the mere fact that two of the records on which defendant chose to rely did not mention a duty to register does not support a reasonable inference that his claimed belief that he did not have such a duty was held in good faith.

Other evidence, moreover, suggests any such belief was *not* held in good faith. By way of example, defendant himself testified that he knew when he met with the correctional counselor that he might be required to register. Yet he nonetheless refused to read the notice to this effect. Then he was told, when he met with the parole services associate and the parole agent, that he in fact *was* required to register. Yet, rather than give the matter due consideration, he instead chose to bury his head in the sand based on a wholly unsupported contention that his 1993 conviction was invalid, an arbitrary and irrational conclusion that two documents' silence regarding a duty to register negated the existence of such a duty, and a fanciful inference that casual remarks by correctional officers suggesting he move on with his life amounted to an order that he conceal his past from authorities by *not* registering, thereby absolving himself of a duty that had been imposed for the very purpose of *preventing* such concealment. Such heedless indifference and

---

[7] The court reporter's transcription of this testimony may be garbled: "Q. Has the judge ever instructed you that you have the order pursuant to Penal Code section 290? A. He has not."

[8] "Q. When you were in court, were you ever ordered to register? A. I do not remember . . . I do not remember being ordered that, no."

willful ignorance do not constitute good faith, and did not warrant an instruction on mistake of law.

As for the charge of giving false information to a peace officer, defendant contends the trial court prejudicially erred in failing to instruct the jury that the prosecution was required to prove, not just that defendant falsely represented or identified himself to the officers to evade the process of the court or proper identification by the officer, but that he did so upon a lawful detention or arrest.

Here, at the request of defense counsel, the court instructed the jury that: "A peace officer is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone." On appeal, defendant argues that this requested instruction did not go far enough, because it did not require the jury to find that defendant's false identification was made in the context of a lawful detention or arrest.

The Attorney General argues that defendant did not present this issue to the court, and it is therefore forfeited. But even if the trial court had refused a requested defense instruction as to what constitutes a lawful detention and arrest, we would conclude that any asserted error was harmless. There was no evidence that the officers' detention and ultimate arrest of defendant was unlawful in any respect. (Cf. *People v. Olguin* (1981) 119 Cal.App.3d 39, 44 ["excessive force by a police officer renders unlawful an otherwise lawful arrest"].) Further, after the officers had detained defendant, by making it clear that he was no longer free to leave, defendant continued to insist on the false identity. In the absence of any evidence to suggest that the detention or arrest was in any way unlawful, the trial court's error in failing to give an additional instruction, beyond the instruction requested by defense counsel, is harmless.

## III.

## DISPOSITION

The judgment is affirmed.

KELETY, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.